No. 17-50387
No. 17-50337

_____

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA

Plaintiff-Appellee,

vs.

JOSE SUSUMO AZANO MATSURA

Defendant-Appellant

_____

Appeal from the United States District Court
For the Southern District of California
Hon. Michael Anello, District Judge, Presiding

**APPELLANT'S OPENING BRIEF**

CHARLES M.  SEVILLA
CA State Bar No. 45930
402 West Broadway, Suite 720
San Diego, California 92101
Telephone: (619) 232-2222
chuck@charlessevilla.com

Attorney for Appellant Azano

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     STATEMENT OF CASE AND FACTS . . . . . . . . . . . . . . . . . . . . 2

III.   STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.  The Dumanis Primary Campaign . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
B.  The Filner Mayoral Election Campaign . . . . . . . . . . . . . . . . . . . . . . 11
C.  Motivation for Influence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
D.  Azano's Defense to the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.  AZANO WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CONFLICTED BY A PROFESSED DISLIKE FOR AZANO AND RENDERED INCOMPETENT PERFORMANCE . . . . . . . 20

A.  Disloyalty, Conflict (Enemy Counsel) and Incompetence . . . . . . . . . . . . . . . 20

1.  Counsel's Opening Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2.  Throwing Away a Major Opportunity to Show That Even an Experienced Thirty Year Former FBI Agent Did Not Know Whether a Foreign National Legally in the U.S. Could Donate to Domestic Campaigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3.  Failing to Introduce Exhibit 1037, a $700 Check Azano Wrote in his name  to "Re-Elect Bonnie Dumanis" early 2013 . . . . . . . . . . . . . . . . . . . . . 24
a.  Failing to Present Evidence of Azano's Lack of Knowledge (Again) . . 25

4. Failing to Introduce Evidence Azano Was Giving Large Sums of Money to Charitable Endeavors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5. Calling Jose Ortega Based on a False Proffer And Having His Testimony Struck . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

6. In Final Argument, Wynne Admitted He Was Caught "Bluffing" Witnesses and the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

7. Insulting the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

8. Wasting Significant Time on Irrelevancies Triggered Objections and Adverse Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

a. Continually bringing up *Citizens United v. FEC*, 558 U.S. 310 (2010)  33

9. Arguing as Prosecution Misconduct Based on the Very Information He Told the Jury about in Opening Statement . . . . . . . . . . . . . . . . . . . . . 34

10. "Throwing Azano under the Bus" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B. Wynne's Conduct Meets The *Strickland* Standard of Ineffectiveness . . . . . . 37

1. The Trial Court Failed to Address this Issue at the Motion for New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

2. The *Strickland v. Washington*, 466 U.S. 668 (1984) Standard . . . . . . . . 38

3. Wynne's Incompetence Prejudiced Azano . . . . . . . . . . . . . . . . . . . . . 39

C. Alternatively, Remand Is Required to Have the Motion for New Trial Hearing to Which Azano Was Entitled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

II. THE INSTRUCTIONS FAILED TO REQUIRE THE JURY TO FIND AZANO KNEW HE WAS VIOLATING THE CHARGED FEDERAL LAW BARRING FOREIGN NATIONALS FROM MAKING POLITICAL DONATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A. The Instruction Given . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B. Willfulness and Specific Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

C. Rule of Lenity Requires the Intent Element Be Defined as Specific
Intent to Violate the Charged Federal Donation Law . . . . . . . . . . . . . . . . . 49

D. The Error Prejudiced Azano . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**III.  THE PROSECUTION FAILED AS A MATTER OF LAW
TO SATISFY THE MATERIAL ELEMENTS ON THE
18 U.S.C. §1519 CONVICTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A. The Court's 1519 Instructions Were Inconsistent and Allowed an Illegal
Path to Conviction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B. Count 33, the Business Donation to the PAC,  Fails Under the First
Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

C. Reversal of the §1519 Counts Requires Reversal of the Conspiracy Count
(Count 1) and Counts 3 and 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**IV. CONGRESS LACKS JURISDICTION TO REGULATE CAMPAIGN
FINANCE IN LOCAL ELECTIONS AND APPLICATION OF SECTION
441E TO A LONG-TERM RESIDENT OF CALIFORNIA (AZANO)
IMPERMISSIBLY BURDENS FREE SPEECH** . . . . . . . . . . . . . . . . . . . . . . 57

**V. FAILURE TO DISMISS THE FIREARMS POSSESSION COUNT (18
U.S.C. 922)  WAS REVERSIBLE ERROR** . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

A.  If the Regulations and Statute Do Not Authorize Azano to Possess
a Gun,  The Law is Unconstitutionally Vague as Applied . . . . . . . . . . . . . 60

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
CERTIFICATE OF WORD COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . 61
ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

AFL-CIO v. FEC, 628 F.2d 97 (D.C.Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Avila v. Galaza, 297 F.3d 911 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 40

Bluman v. FEC, 800 F.Supp.2d 281 (D.D.C. 2011) . . . . . . . . . . . . . . . . . 18, 45, 46

Buck v. Davis, 137 S.Ct. 759 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Burdine v. Johnson, 262 F.3d 336 (5th Cir. en banc 2001) . . . . . . . . . . . . . . . . 40

Burrage v. U.S., 134 S.Ct. 881 (2014.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 55

Christeson v. Roper, 135 S.Ct. 891 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Citizens United v. FEC, 558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . . . . . . . passim

Doe v. Busby, 661 F.3d 1001 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Francis v. Franklin, 471 U.S. 307 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Gentry v. Roe, 320 F.3d 891 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Gersten v. Senkowski, 426 F.3d 588 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 57

Gibson v. Clanon, 633 F.2d 851 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . 53

Goodwin v. Balkcom, 684 F.2d 794 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . 36

Hanlester Network v. Shalala, 51 F.3d 1390 (9th Cir. 1995) . . . . . . . . . . . . . . . . 47

Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Hart v. Gomez, 174 F.3d 1067 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

In re Winship, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Javor v. U.S., 724 F.2d 831 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Johnson v. U.S., 135 S.Ct. 2551 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) . . . . . . . . . . . . . . . . . . . . 38

Ladner v. U.S., 358 U.S. 169 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Lanzetta v. New Jersey, 306 U.S. 451 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Lord v. Wood, 184 F.3d 1083 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Maples v. Thomas, 565 U.S. 266 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

McDonnell v. U.S., 136 S.Ct. 2355 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Neder v. U.S., 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Patterson v. Gomez, 223 F.3d 959 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 50

People v. De Simone, 138 N.E.2d 556 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ratzlaf v. United States, 510 U.S. 135 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . 47

Rhoden v. Rowland, 172 F.3d 633 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 53

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Sacher v. U.S., 343 U.S. 1 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Screws v. U.S., 325 U.S. 91 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Skilling v. U.S., 561 U.S. 358 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . passim

Thompson v. Haley, 255 F.3d 1292 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 22

U.S. v. Abushi, 682 F.2d 1289 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

U.S. v. Aguon, 851 F.2d 1158 (9th Cir. en banc 1988) . . . . . . . . . . . . . . . . . . . . . 51

U.S. v. Alferahin, 433 F.3d 1148 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S. v. Brown, 623 F.3d 104 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

U.S. v. Daychild, 357 F.3d 1082 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S. v. DeTar, 832 F.2d 1110 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

U.S. v. Goland, 959 F.2d 1449 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

U.S. v. Homa Int'l Trading Corp., 387 F.3d 144 (2d Cir. 2004) . . . . . . . . . . . . . 47

U.S. v. Little, 753 F.2d 1420 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

U.S. v. McDonald, 576 F.2d 1350 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . 51

U.S. v. Miller, 767 F.3d 585 (6th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

U.S. v. Nickerson, 556 F.3d 1014 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S. v. Orellana, 405 F.3d 360 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

U.S. v. Piepgrass, 425 F.2d 194 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 51

U.S. v. Reyes Vera, 770 F.3d 1232 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . 54

U.S. v. Span, 75 F.3d 1383 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 54

U.S. v. Stapleton, 293 F.3d 1111 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 44

U.S. v. Steele, 733 F.3d 894 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

U.S. v. Whittemore, 776 F.3d 1074 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . 48, 49

U.S. v. Whittemore, 944 F.Supp.2d 1003 (D.Nev. 2013) . . . . . . . . . . . . . . . . . 48

Zapata v. Vasquez, 788 F.3d 1106 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . 42

## STATUTES

2 U.S.C. § 437 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 44, 47

2 U.S.C. § 441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 47

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 44, 51

18 U.S.C. § 922 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 57, 58

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1519 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## REGULATIONS

22 C.F.R. § 41.31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

No. 17-50387
No. 17-50337

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA   )
   )
       Plaintiff-Appellee,   )   CR 14-388 MMA
v.   )   Southern Dist. of Calif.
   )
JOSE SUSUMO AZANO MATSURA)
   )
       Defendant-Appellant.   )
_____)

## INTRODUCTION

Jose Susumo Azano Matsura [hereafter Azano] is a 52 year-old Mexican citizen with a U.S. citizen wife, children and a home in Coronado, California. He has no prior criminal record. He operated a successful security technology business in Mexico which conducted business worldwide. Azano had been lawfully residing in Mexico and the United States. In the United States, he possessed proper visas, but is considered a "foreign national" because he is not a U.S. citizen or permanent resident. 1ER 16[1] (indictment). The case grew out of Azano's alleged efforts to gain influence with San Diego mayoral candidates

_____

[1] ER is the Joint Excerpt of Record (3 volumes, page numbers are penciled bottom right of each page). See April 17, 2018, Commissioner's Order. Dkt. 951.

1

through campaign donations. According to the government, in late 2011, Azano began supporting then District Attorney Bonnie Dumanis in her primary campaign for San Diego mayor. Azano allegedly recruited "straw" donors, funded a political action committee and "in kind" media services.

Dumanis lost the primary in Spring 2012. Azano then supported Bob Filner in the general mayoral election, again using a straw donor to make several large contributions to political committees, a PAC supporting Filner, and media services. 1ER 14-18, 21-25 (indictment).

Ravi Singh was prosecuted based on allegations that through his company, ElectionMall, he provided social media services to the Dumanis and Filner campaigns, paid for by Azano. The contributions were not reported by the campaigns. Azano and Singh thus made "in-kind" contributions which Azano was prohibited from doing as a "foreign national." 1ER 16, 20-22, 24-25.

After a twenty-four day trial and six days of jury deliberations, Azano was convicted of 36 counts relating to election donation offenses. An additional conviction for possession of a handgun by a foreign national followed.

## I. STATEMENT OF THE CASE AND FACTS

**A. Statement of the Case.** On February 18, 2014, as superseded on July 8, 2016 (1ER 13-35), Azano was indicted for: **Ct. 1**, Conspiracy to Commit Offenses

2

Against the United States (18 U.S.C. §371); **Ct. 3**, Campaign Donation or

Contribution by a Foreign National Aggregating $25,000 or More (2 U.S.C.

§437g(d)(1)(A) & 441e(a)(1)(A)); **Ct. 4**, Contribution in the Name of Another

Aggregating $25,000 or More (2 U.S.C. § 437g(d)(1)(A)) & § 441f; **Cts. 5-37,**

Falsification of Records (18 U.S.C. §1519 and § 2); **Ct. 39,** Alien in Possession of

a Firearm (18 U.S.C. § 922(g)(5) (B), and aiding and abetting (18 U.S.C. § 2).

Counts 2 and 38 were dismissed.  See Addendum for statute content.

Pre-trial motions were extensive and the jury trial lengthy.  Azano was

convicted.  On October 27, 2017, he was sentenced to 36 months custody on all

counts to run concurrently, with fines totaling $560.955.00.  1ER 3-4.

**B. Statement of Jurisdiction.**    The district court had jurisdiction over the

charges. 18 U.S.C. §3231.  This court has jurisdiction over the final judgment (28

U.S.C. §1291; 18 U.S.C. § 3742(a)) entered November 3, 2017. 1ER 3–7.  Notice

of appeal was timely filed November 9, 2017. 1ER 1.

**C.  Bail Status.**    On December 19, 2017, Azano's motion for bail on appeal

was denied. CR 894. He is in federal custody in Sandstone, Minnesota.

## II.              STATEMENT OF ISSUES

1. Was the representation of defense counsel so incompetent as to deny Azano a

fair trial so as to warrant reversal on direct appeal, or must it be remanded?

3

2.  Does the instruction of intent to commit the offense of illegal campaign donations by a foreign national require the jury to find offense-specific intent to violate that law?

3.  Were the falsification of records (18 U.S.C. §1519 and § 2) counts proven where there was no evidence connecting appellant to falsifying records, and was the jury properly instructed?

4.  Does the federal government have jurisdiction to police local election activity and do prosecutions involving local election activity violate the First Amendment?

5.  Is firearm possession permitted by persons holding valid visas to be in the United States?  If not, are the statutes and regulations so vague that no person could understand what is prohibited?

## III.       STATEMENT OF FACTS

Azano was a successful, extremely busy businessman working outside the United States.  He spent as much as 80 to 90 percent of his time traveling outside the U.S..  His defenses to the donation charges were that he did not know in some cases they were even made, and he did not know it was a violation of federal election law to donate money to local political candidates.

4

A.  The Dumanis Primary Campaign.

*1. Bonnie Dumanis* testified that Ernie Encinas was a former San Diego detective whom she knew for many years starting when she was a Deputy District Attorney.  3ER 51.  Encinas, a security company owner and nightclub consultant, headed Azano's family security detail.  Encinas had access to political figures based on his contacts and prior work as a law enforcement officer.  By currying favor with political candidates and orchestrating donations, Encinas, stood to gain personally. He wanted a new mayor who would find a Police Chief more sympathetic to the nightclubs his security firm serviced.  Encinas bragged to others he could get Azano to donate to persons he recommended.  3ER 40, 2ER 89.  Azano had never been active in San Diego politics.  2ER 76.

In 2011, when Dumanis ran for mayor,  Encinas served on her finance committee.  2ER 84. He helped set up a PAC for her. 2ER 85, 87.  In December 2011, she went to Azano's home for lunch where Encinas introduced her to him. 3ER 52.  On Christmas day, she wrote an email to her supporters saying she had a conference call with Encinas, Azano and Ravi Singh, an election media consultant. 3ER 57. She didn't recall the phone conversation at trial, but testified she never discussed money with Azano.  3ER 59.  She thought Azano was a U.S. citizen.

5

3ER 54. Dumanis heard from one of her fundraisers, Kelli Maruccia, that Azano had helped raise some contributions for her. 3ER 60.

In September 2012, after she lost the primary, Dumanis received an email from Maruccia saying: "Mr. A [Azano] via Ernie [Encinas] has asked if you can sign a letter of recommendation for his son, who is trying to get into UCSD." 3ER 63-64. She routinely wrote such letters when asked, and did so here. 3ER 55-56.

*2. Meeting Sheriff Gore, March 2, 2016.* Encinas arranged for a meeting with Dumanis, Azano and Sheriff Gore at the Sheriff's office. It lasted about 30 to 40 minutes and there was no substantive discussion of Dumanis's campaign. 2ER 93. Adrian Reyes was with Azano that morning. The two intended to go shopping when they got a call from Encinas who "badgered" Azano to meet the Sheriff that morning. 3ER 47. Neither Azano nor Gore appeared to understand the purpose of the meeting. 3ER 48, 49. They "basically talked about golf" and "about some of what Mr. Azano does for a living." 3ER 49.

*3. Straw Donors.* Several straw donors[2] testified they donated to Dumanis's primary campaign and were reimbursed. None of these donors spoke with Azano,

---

[2] Together with the Filner donations, these form the basis for the 18 U.S.C. 1519 counts 5-37.

but did so with his employees (Jason Wolter, Elizabeth Lugo) or Azano's son, Susu, or businessman Marc Chase.

    *a. Elizabeth Lugo*. Able Garcia-Davila, Azano's bookkeeper, said Lugo, Azano's secretary-assistant, asked he and his wife to donate $1,000 in December 2011. He did and was reimbursed. He never spoke to Azano about it. 2ER 27-29.

    *b. Jason Wolter.* Wolter testified Azano was his best client when he worked at a clothing store. He went to work for Azano. Wolter testified Azano's son, Susu, asked him to get individuals to donate to the Dumanis campaign. 2ER 63. He said reimbursement money came from appellant's house, or from Azano, but did not recall who gave it to him. Id. at 64, 66. Wolter arranged donations from: Marcel Kasmer (2ER 39), Brent Marchioni (2ER 40-41), Brian Duarte (2ER 68-70), Matthew Guillory (2ER 55-57), and Philip Mikelatos. 2ER 58-61.

    c. *Azano's son, Susu.* Susu got Diego Duque got to donate and Duque arranged donations from others (Aneleas Duque, Itzel Durazo, Betty Hart, and Jose Garcia for a total $2,500). Duque was reimbursed by Susu. 2ER 43-44.

    d. *Marc Chase.* Chase was a car dealer and owner of Symbolic Motors. He sold many expensive cars to Azano. 2ER 243. Chase testified that in late 2011, Azano asked him to "get my employees and friends to donate $500 to the Bonnie Dumanis campaign." He said they would be reimbursed. Elizabeth Lugo gave

Chase contribution envelopes and money at Azano's home. 2ER 249-251. Chase got his employees to donate a total of $9,000 to Dumanis, and he reimbursed them. 2ER 252-253.[3]

*4. The AIRSAM PAC contribution.* Ernie Encinas contacted political consultant, John Wainio, a Dumanis supporter, about setting up a PAC so that Encinas's clients could contribute to it. 2ER 72-74. Encinas mentioned a night club owner and a wealthy Mexican, Azano. 2ER 75. Wainio was dubious about Azano because he had never been active in politics. 2ER 76. He spoke with Dumanis and asked if Azano had a green card, but she responded with "a long silence." 2ER 77. He decided not to be involved. 2ER 78. He was uncomfortable dealing with Encinas whom he thought was "a little slimy" and trying to appear influential to impress Dumanis. 2ER 79, 81-82.

Eventually, Encinas contacted another consultant who formed a PAC named "San Diegans for Bonnie Dumanis for Mayor 2012, sponsored by Airsam N492RM, LLC." In May 2012, a newspaper reported the $100,000 contribution

---

[3] Chase cooperated with the government and settled his felony criminal charges of fraud, money laundering, and conspiracy by pleading guilty to eight misdemeanors. 2ER 289. After Azano's trial, he received probation.

from Airsam N492RM[4] to the PAC.  3ER 61-62. The PAC reported the donation. 2ER 88.

   *5. Electionmall and Dumanis Campaign.*  Ravi Singh owned Electionmall, a world-wide social media business aiding political campaigns. Jennifer Tierney was a Political Consultant for the  Dumanis campaign. 2ER 94-95. She and Dumanis decided to upgrade the campaign website.  2ER 101.  Tierney spoke with Singh about the website to see if he could volunteer his time.  2ER 103-104.  In discussing pricing, she told him they couldn't afford him and no contract was executed.  He was to volunteer.  2ER 109-111.  Singh said "he wanted to break into the San Diego market and that is one reason why he might consider volunteering."  2ER 112.  It "was clear he would not be paid."  2ER 113.

   Ronald Nehring joined the Dumanis campaign team when the campaign was underway. 2ER114-115.  He believed ElectionMall was a vendor to the campaign being paid to do their work.  2ER 130. He estimated that the value of the work ElectionMall did on the web page redo was worth a couple of thousand dollars. 2ER 141a.

---

[4] AIRSAM was United States Limited Liability Corporation. ER 98.  It was formed in 2008 and incorporated in Delaware. The AIRSAM bank account has Azano as a signer. The California Secretary of State records show him as the CEO. ER 237-240. This contribution became Count 33.

Aaron Ronsheim was Electionmall's Manager of Communications in 2012. The company assisted many political campaigns. In 2010, for example, it had "a thousand different campaigns as clients." 2ER 142. He handled sales and accounts, but had nothing to do with accounting. 2ER 143, 151. The most knowledgeable people to discuss Electionmall invoicing and payments in 2012 were Jennifer Fulton, Savina Singh, Tom Pathiyil and Jay Batel. 2ER 177. None were called.

Electionmall did work for Azano on the Cordero presidential campaign in Mexico in 2011 and 2012. 2ER 144. "[T]hat was a big operation." 2ER 173. Electionmall was also doing paid work on two other Azano projects, "Castle" and "Snake," which had nothing to do with San Diego mayoral campaigns. This work was also ongoing in fall of 2012. 2ER 166.[5]

In December 2011 and January 2012, Ronsheim was involved in discussions about paid work to be done for the Dumanis for Mayor campaign. 2ER 145. Encinas, but not Azano, was included in these communications. Indeed, Encinas

---

[5] The court excluded testimony that "Mr. Azano and his company paid ElectionMall very substantial sums of money, north of $100,000 each, for the Castle and Snake projects." 2ER 176. For the Cordero work in Mexico, Azano paid ElectionMall hundreds of thousands of dollars. 2ER 178, 179.

introduced Singh to the campaign. 2ER 146, 156. Electionmall agreed to do website work for the campaign for $495 a month. 2ER 147. Little was done until March 2012 when web design started. 2ER 157. By mid-April, the new website was launched, as Ronsheim informed Encinas. 2ER 148-149. The only online ads ordered for Dumanis were done between June 1st and election day, June 5th or 6th. 2ER 158, 159. Singh told him Azano was paying ElectionMall. 2ER 150. ElectionMall agreed to defer receiving payments until after the June primary. 2ER 160-161. No one tried to hide ElectionMall's work on the Dumanis campaign. 2ER 163. Ronsheim testified the average revenue generated from ElectionMall's U.S. clients was $3,000 to $3,500. 2ER 153.

### B.  The Filner Mayoral Election Campaign

After Dumanis lost the June primary, Mark Chase made donations to the Bob Filner for Mayor campaign as well as the Democratic Congressional Campaign Committee (DCCC) and San Diego County Democratic Party (SDCDP). Chase testified Encinas told him to pay these entities.

*1.  Donation to the Filner PAC.* William Wachob was a longtime Filner supporter. After the June primary, he set up an "I.E.," an independent expenditure committee, or PAC, called San Diegans in Support of Bob Filner for Mayor of

2012. 2ER 199. He met with Encinas and lobbyist Marco Polo Cortes in October of 2012, and they spoke about a client who could contribute. Encinas suggested Wachob consider using social media. He asked if Wachob knew Singh. 2ER 201. Wachob knew Singh, spoke with him the next day, but didn't hire him. 2ER 202.

In late September 2012, Wachob met Mr. Cortes who handed him a South Beach Acquisition check for $120,000 dated September 27, 2012. It was payable to his PAC. Cortes said the check was from one of Encinas's clients. 2ER 204-207. Wachob investigated the source of the check and discovered South Beach Acquisitions was owned "by a guy [Marc Chase] in La Jolla who also owns Symbolic Motors [a] reputable business [that] sell[s] high-end cars." 2ER 208. Wachob's PAC received a total of $1.2 million so this was not the largest check it received. 2ER 214. Virtually all the PAC's money was spent on television commercials. 2ER 209.

*2. Electionmall Service to Filner's Campaign.* Testifying with immunity, Ed Clancy, Filner's campaign manager (2ER 215-216), said Filner (not Clancy) attended a meeting at Azano's home in August 2012. Clancy's impression was that Azano would support the campaign. 2ER 217-218.

12

In the early October 2012, Clancy met with Encinas and Cortes. They said they had somebody who could help with the campaign's social media. 2ER 218-222. The next day Clancy met with Singh and employees Miguel de la Vega and Meghan Standefer at campaign headquarters. 2ER 223. This was just weeks prior to the November mayoral election.

Clancy "guessed" their "proposed" services would cost between $50,000 to $100,000. 2ER 225. This guess was based on "early experience in political consulting." Yet, he had never purchased services similar to those Singh provided to the campaign and he could not give "any estimate for the cost of the website on a monthly basis for the Filner campaign." 3ER 24, 24a , 25. Tom Shepard and his entire team of Filner consultants received about $5,000 a month. 3ER 26.

When Clancy asked Singh for an invoice, he was told it was "taken care of." 3ER 27. Clancy never asked who was paying. 3ER 28. There was no effort to hide ElectionMall's work on the campaign. 3ER 29.

Clancy believed the Filner Campaign did not have a legal arrangement with ElectionMall. 2ER 226. He was told by Encinas, "Mr. Azano had paid Ravi hundreds of thousands of dollars for work in Mexico,"[6] and given those enormous

---

[6] ElectionMall, through its company eSolutions invoiced Azano's Mexico-based company Broadlink. The government argued these invoices were

(continued...)

sums paid for that work, Singh was working the final weeks for Filner as a favor to Azano. Encinas said money paid ElectionMall was not specifically for the Filner campaign. 3ER 36-37.

At Filner's mayoral inauguration, Encinas introduced Clancy to Azano, saying "this was the gentleman who took care of Ravi." 2ER 230. Encinas said Azano was interested in having a friend in the Mayor's office who might help on development projects. 2ER 232-233. Encinas was adamant that Azano never sought a quid pro quo from Filner or Dumanis. 3ER 38-39. Encinas bragged to Clancy that he had such influence over Azano that Azano would support anyone Encinas pushed him to support. 3ER 40. Clancy knew Encinas's agenda in the mayoral race: he wanted the Chief of Police replaced. 3ER 41. Everything Clancy assumed about Azano "was all coming through Ernie Encinas." 3ER 42-43.

3. *Marc Chase*. Azano was one of his best car customers who bought expensive cars. They became friends. 2ER 243-244.[7] He knew Azano traveled

---

[6](...continued)
for Filner work. Singh argued they were for his work on the Snake, Castle, and Cordero campaigns.

[7] Azano loaned him three million dollars. It was unsecured. Chase said this was "very generous of" Azano. 2ER 278-280. He still owes Azano two million dollars on the loan. 2ER 282.

weekly to Mexico for work, normally leaving Monday morning and come back Thursday or Friday. 2ER 248.

In August 2012, Azano sought to buy a portion of Chase's car business and a contract of sorts was signed on piece of paper (2ER 254), but the deal allegedly died because Encinas told Azano that there was a police investigation of Chase. 2ER 245-247. "The mother of my daughter talked to Ernie and made accusations." 2ER 281. Chase said the deal "was never finished." 2ER 260. He testified Azano had Thomas Berg do due diligence on Chase's business to examine documents. At the conclusion, Azano did not want to buy the business. 2ER 286-289. Nevertheless, Chase sold the watch Azano given as a down payment for $1.25 million and pocketed the proceeds. 2ER 258, 283-184. Chase testified Azano may well have believed he had an interest in the business and referred to Chase as "partner." 3ER 4.

In September of 2012, Chase met with Azano and Encinas in the kitchen of Azano's home. Chase said Azano asked him to make a $180,000 contribution, for which he would be reimbursed. Azano told him Encinas would discuss the specifics of the donations. 2ER 261-262. Thereafter, Encinas came to his business and instructed Chase to write checks to: 1) San Diegans in Support of Bob Filner for Mayor for $120,000 dated 9/27/2012 drawn on his company South Beach

15

Acquisitions; 2) the Democratic Congressional Campaign Committee (DCCC) for $30,000 drawn on his personal account; and 3) the San Diego County Democratic Party (SDCDP) for $30,000. Encinas then took all three checks and left. 2ER 263-273, 290-291.[8]

Chase testified the $180,000 reimbursement came in the form of a $380,000 check from Azano which was to cover the above donations and a $200,000 painting Azano bought from him. 2ER 272-273.

    *3. ElectionMall and Filner.* Electionmall employee Meghan Standefer testified we "were brought on just three weeks before the election. 2ER 164. Aaron Ronsheim testified that no work was done on Filner's campaign before October 14, 2012. 2ER 180. Ronsheim said ElectionMall ads for Filner's campaign were less than $5,000. 2ER 167.[9] Singh told Ronsheim the Filner work would be paid by Azano although Singh was unclear about this. 2ER 182. Singh thought Azano legally could make contributions. 2ER 171, 183. In October 2012,

---

[8] Azano argued the money transfer was for a Rolls Royce he bought from Chase for $396,448.57. CR 921: 8/12/16, RT 180.

[9] The value of the Microsoft ads was $3,025. The cost of Google ads was $1,332.40. 2ER 168, 170.

Clancy was told by ElectionMall employee de la Vega that Azano was paying for ElectionMall's work. 3ER 18.[10]

### C.  Motivation: Possible Influence

The government argued Azano decided to contribute to the mayoral candidates for influence following the election. Witnesses testified that Azano expressed a vision for possible developments in San Diego.  The government labeled one as "Miami West."   But Azano never pursued this. He never: attempted to purchase land for development, hired realty development professionals to explore location, sought building or zoning permits, or considered regulations, traffic studies, or environmental impact.  He never pursued the matter with either Dumanis or Filner.

Manuel Rodriguez, Hector Osuna, and Eduardo Gomez, close friends of Azano's, testified Azano never mentioned any development projects for San Diego. 3ER 97, 97a, 110-111.

---

[10] Clancy had four meetings with the government in July and August 2016 and in all four meetings the government brought up this statement to him. The government stipulated that the statement never appeared in FBI 302s.  3ER 17, 19. The failure to produce this in discovery prompted a mistrial motion which was denied.  3ER 31.

D. Azano's Defense to the Charges

1. *Azano did not know it was against federal election law for a foreign national, legally in the United States, to contribute.* Azano's counsel stated, he "had nothing whatsoever to do with and no knowledge of any of the other transactions." 3ER 120-121. As Mr. Kretzer (counsel Azano brought in for instructions): "the *Bluman* [*v. FEC*, 800 F.Supp.2d 281(D.D.C. 2011)] case...will require proof of the defendants knowledge of the law.... Making a campaign contribution is not in and of itself unlawful and wrong. It's not a willful violation of the law." 3ER 123-124.[11]

2. *Except for Wolter and Chase, There Was No Direct Evidence Azano Asked People to Donate.* Despite the avalanche of emails, texts, and phone call evidence, there is not one between Azano and a politician, nor any "smoking gun" showing Azano knew he could not make donations. A number of defense witnesses testified Azano never asked them to make political donations, e.g.

---

[11] "[O]ne of our defenses is, you know, Ernie [Encinas] and to the extent anybody else involved; frankly, they didn't know what the heck they were doing. They were running around....so one of the things is not necessarily knowledge of illegal activity." 2ER 273a. Singh and Azano argued: the government must show they knowingly violated federal election law. 3ER 83, 85. Azano argued to the jury: "the most crucial instruction that you will hear and that is knowingly and willfully... There is no [proof of the] knowledge element. There is no willfully." 3ER 137a: As co-defendant's counsel stated: "Mr. Azano...he's got to know it's against the law for a foreign national to contribute money." 3ER 146.

businessman Adrian Reyes. 3ER 50. Elizabeth Lugo testified that Encinas directed her to help get the straw donations, not Azano. 3ER 75-82. "Ernie was asking us all of us to donate and all of us we were donating and trying to help him out." 3ER 91. "Ernie got us into all these problems." 3ER 96. Azano's accountant, Hermelinda Cortes, testified Azano never asked her to contribute and never spoke of a political campaign. 3ER 99.

## IV.　　SUMMARY OF ARGUMENT

This case involves incompetent representation so awful, racist, and conflicted, that these convictions cannot survive. The instructions on the intent required for conviction lacked the essential element that Azano know it was against federal law for a non–permanent resident to donate. Further, appellant's conviction for possessing a firearm in his home must fail because his visa and/or the regulations for visa holders, permitted such possession. Azano adopts the summary of the issues in Singh's brief on the lack of jurisdiction and First Amendment bars to this prosecution, and the discussion of 18 U.S.C. §1519. (Arguments I, II and IV.)

**ARGUMENT**

## I.  AZANO WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CONFLICTED BY A PROFESSED DISLIKE FOR AZANO AND RENDERED INCOMPETENT PERFORMANCE

This Court will never see a defense counsel act so contrary to his own client's interests.  Starting with opening statements to the jury, defense counsel, Michael Wynne, gratuitously made racist comments about Azano, told the jury he personally disliked him, labeled him a "bad guy," mocked his physical appearance, had him stand as an exhibit to demonstrate his point, and told them Azano had been investigated by the FBI for numerous serious crimes.  The misconduct continued throughout the trial into final arguments where he admitted to the jury he had been "bluffing" by making false representations to certain witnesses.   Azano never had a chance for a fair trial once his counsel betrayed him in opening statement.  This was a defensible case.  Azano was a very generous person, hard working and a gentleman.  Yet the incompetence and disloyal representation painted a false picture and prejudiced Azano's fair trial rights. All donation related counts must be reversed.

### A.  Disloyalty, Conflict (Enemy Counsel), and Incompetence

1.  Counsel's Opening Statement. Azano's defense was that he either did not know: a) of some of the donations, or b) when he did know, that they were illegal

for him to make. Azano's family security head, Ernie Encinas, admitted to Clancy,

Filner's Campaign manager, that Azano gave money at his direction largely to

advance Encinas's goals. Azano was so unaware of his inability to donate he sent a

large business check to a Dumanis PAC in mid-2012, and then a personal check in

2013 containing his name and address to Dumanis for her District Attorney

Re-Election bid. Wynne's failed to meaningfully present these defenses.

Wynne's opening statement demolished Azano's chances with the jury. He

disparaged Mr. Azano as his enemy with racist comments: he "doesn't look like any

of you. He's a Mexican American of Japanese decent" with a little "poppy nose"

(2ER 9), and then added his personal dislike for him:

> Wynne: At the end of the day, you may not like Mr. Azano. I'll tell you
> what, there are many days here I don't like him. But that's not my job.
> He's not my friend. He's not your friend. He's not the first guy I want
> to get a beer with. At the end of the day, I am glad to get away from
> him. I was upset when he showed up in my room last night with some
> ideas. I want to get away from this guy. He's intense. He is a successful
> businessman. He's got a little poppy nose. Tough to look at him. I
> don't like him. 2ER 9.

After disparaging Mr. Azano physically and personally, Wynne gratuitously

informed the jurors that they would learn that Azano had been investigated for years

by the government for a plethora of uncharged *serious crimes*:

> Wynne: There was a series of investigations. And these individuals,
> including . . . FBI Agent . . . Special Agent Phan, who actually

conducted the search and was involved in practically every interview
of every one of these individuals tried to get Mr. Azano on something.
Narcotics trafficking, bribery, extortion, taxes, something for years.
And they invested tons of money, tons of resources, FBI agents, all
these wiretaps, sending people in, schemes, something, something back
to 2011, 2010. You'll hear a lot of that. They could not get anything to
fill out this plot. 2ER 10-11.

The jury did not "hear a lot of that." They heard none of it because it was baseless,

irrelevant, inflammatory, and previously ruled inadmissible. Wynne himself moved

just prior to trial to exclude comment about "involvement in any kind of narcotics

trafficking, arms smuggling, or any related activity. Such allegations," he argued,

"are inflammatory and utterly false." 1ER 159. *The court granted his motion*. 1ER

83-84. In contravention to his own motion and the court order, he told the jury they

will hear "a lot" about it. They heard nothing of it *except from him*. See *Thompson*

*v. Haley*, 255 F.3d 1292, 1304 (11th Cir. 2001) ("Counsel could hardly hope to

persuade a jury to be merciful while at the same time stressing the immoral and

worthless quality of their client's life and also reminding the jury that they were

appointed by the court to represent...."); *People v. De Simone,* 9 Ill.2d 522, 529, 138

N.E.2d 556 (1956) (ineffective counsel introduced evidence that his clients were

evil men and hardened criminals who had previously committed numerous

burglaries.)

Continuing his disparagement of Azano, Wynne told the jury (again) that they too "don't have to like Mr. Azano" (2ER 15), adding, "I really feel this is a bad guy. I feel it in my gut. He's a bad guy." *Ibid.* He warned, "You may have it in your gut that somebody did something wrong *because of what this guy looks like*." 2ER 16-17; italics added. He concluded opening statement by reminding the jurors, "You don't have to like me. A lot of people don't. I don't like him [Azano], this is my job." 2ER 17.

After establishing his dislike for Azano, calling him a "bad guy," making racist comments[12] about his physical appearance, and suggesting far-ranging criminality, Azano's chances of a fair trial were gone. If his own attorney would turn on him, why should they not do the same? To make sure of this, Wynne's misconduct continued during the trial. The following are examples:

---

[12] Other race tinged comments include describing Ernie Encinas, a Hispanic, in final argument: "I don't know how else to describe Ernie, a vice cop, black man, black male, blackmail." 3ER 140. Prior to trial, Susu sought a severance for health reasons and had a doctor available to talk to the government about his condition. Wynne stated: "in case he [the prosecutor] doesn't say, "well okay. You [the doctor] are telling the truth, I believe you. Even though you are Mexican. I believe you." The government retorted, "The nationality or ethnicity of the witness has nothing to do with the legal decisions in this case." 2ER 2.

2.  Throwing Away a Major Opportunity to Show That Even an Experienced Thirty Year Former FBI Agent and Campaign Finance Director Did Not Know Whether a Foreign National Legally in the U.S. Could Donate to Domestic Campaigns. San Diego Sheriff Gore, director of campaign financing for Bonnie Dumanis, was asked by the prosecution if he knew if a foreign national could donate to campaigns.  He answered, "I do now." 2ER 91.  Wynne inexplicably objected to the answer which was sustained. *Ibid.* The relevance of the answer was obvious: If the most experienced law enforcement officer in San Diego and a long time FBI agent,[13] and campaign finance chair did not know Azano could not donate, how could Azano?

3.  Failing to Introduce Exhibit 1037, a $700 Check Azano Wrote in his name to "Re-Elect Bonnie Dumanis" early 2013.  This evidence, a campaign donation signed by Azano, would have demonstrated Azano's lack of knowledge he could not contribute.   For this reason, the government believed Wynne would introduce the check and told the jury in opening statement,  "a few days after Bob Filner was inaugurated…the defendant was asked again to support Bonnie Dumanis.  This time for her run for District Attorney…he decided to write a token $700 check to her, to

---

[13]  Until his retirement from the FBI in 2003, Sheriff Gore served over 32 years in the FBI. 2ER 90.

show his support." 2ER 5; Proposed Def. Exh. 1037. A month later at the end of the trial, Wynne had made no attempt to introduce the check into evidence. Prior to final argument, the government stated he should not be able to argue as evidence what the government said in its opening. 3ER 127. Wynne then said he had asked the government to stipulate to its admission "as a professional courtesy." *Ibid.* They didn't and there the evidence died. Wynne made no effort to call a witness to introduce the check. Azano's donation check was demonstrable evidence he was unaware of laws prohibiting him from making contributions.

*a. Failing to Present Evidence of Azano's Lack of Knowledge (Again).* At the end of the trial, Wynne requested that a summary of *Citizens United* be read to the jury asserting, "Encinas showed this to Mr. Azano multiple times…[and Encinas and Kelly Maruccia] said also that everything [about donations] was fine and okay.…" 3ER 119. Such testimony by Encinas or Maruccia would have been highly relevant to Azano's innocent intent, but Wynne presented nothing to support it, and the exhibit was rejected.

4. Failing to Introduce Evidence Azano Was Giving Large Sums of Money to Charitable Endeavors. A theme of the defense was that Azano was extremely busy with his business and out of San Diego traveling most of the time. Thus, he would be dependent on a person like Encinas, who was in charge of security for his

25

family in San Diego. To contradict the notion that Azano was an involved political player busy directing his money toward San Diego mayoral candidates, Azano was making numerous charitable donations, none of which Wynne attempted to introduce and none of which sought influence or power.[14] As documented in Azano's sentencing memo (CR 857), and pre-trial motions, examples included: Azano was asked to help a thirteen year old boy, a stranger to him, with medical expenses for a bone marrow transplant. The cost was $250,000 for the transplant and Azano contributed $100,000. A company committed to contribute the remaining $150,000, but backed out. Azano paid the entire amount to save the young boy. When approached by Leanne Kim for the Japanese Tsunami Fund to assist the devastated victims in Japan, Mr. Azano provide $75,000 to the cause. On 4/15/11, he gave $50,000 to the San Diego Asian Film Festival. On 6/4/12, he gave $100,000 to the Festival. On 5/11/11, he gave $15,000 to the Fundacion Boletos/Patronito Barraquez. On 12/7/11, he gave $50,000 to the St. John's Episcopal Church and Day School. On 10/13/12, he gave $25,000 to the San Diego Asian Film Festival. In 2011-2012, Enrique Acosta suffered life threatening medical issues, including a heart attack. Because he had no insurance, Mr. Azano

---

[14] Perhaps it would have been inconsistent with Wynne's hostile characterization of Azano as "bad guy." Wynne knew of the donations. Two defense pre-trial discovery motions by previous counsel cite them. 1ER 155-158.

paid $300,000 for his medical and personal expenses. He paid $10,000 for one of his security guard's funerals and burial expenses plus an additional contribution to the family to ease the pain of their loss. The Archbishop in Guadalajara stated Azano donated 1.5 million pesos (about $88,000) to the church.

The point of the donations would have been to show Azano as not only extremely generous, but that his generosity was exploited by Encinas who directed his money to San Diego political campaigns in which Azano had never before been involved or even expressed interest. Encinas had a motive; he wanted to be a player in San Diego politics. Encinas emails show he was involved in campaign work for Dumanis well before he had Mr. Azano contribute. 1ER 138-144.

5.  Calling Ivan Ortega Based on a False Proffer And Having His Testimony Struck.  Prior to Wynne calling this witness, the government objected because, "Mr. Ortega is the next witness. He has been in the courtroom and listening to the proceedings over the course of at least part of three of the weeks of trial." 3ER 66. 8/24:130.  The court said this rule violation never should have happened. "I don't think it has ever happened to me before. You guys are just very unique in my book. Usually, when I tell the lawyers no witnesses, they say fine Judge and we never have people get up, they grumble but they get up and they walk out. And we never

27

have this problem...there is no excuse for it." 3ER 69. This was only the start of the problems with Ortega's testimony.

Wynne replied that at the beginning of trial he did not anticipate putting on a defense. 3ER 131. Yet, when Ortega was cross-examined, he was asked: "the whole time from the first point you were contacted before trial, you understood you might be needed to testify here." He answered, "yes." 3ER 70. He received his defense subpoena the first week of August. 3ER 203. In other words, Wynne dissembled about not thinking about calling witnesses at the start of the trial.

The government sought an offer of proof for Ortega's testimony. Wynne dissembled again. He proffered that Ortega would address the entrapment by estoppel defense to the possession of the gun charge by evidence that an FBI agent, aware of Azano's lack of permanent residency, told him he could have a gun for protection. "This is a joint operation with the FBI and the Government of Baja California....a threat was made or there was a threat that was made particularly to Susu [Azano's son] and Mr. Azano was aware of that. And Mr. Ivan Ortega arranged the meeting at the FBI with Mr. Drickersen dressed in official FBI gear, making his official capacity confirming and making sure that Mr. Azano did have a weapon, suggesting he should have a weapon, that these were legitimate important

concerns and that Mr. Drickersen was aware that Mr. Azano did not have a green card." 3ER 71-72. This proved false.

Ortega was allowed to testify before the jury. The best he came up with was that he, Azano and the FBI agent met in a car and discussed security issues in Azano's home. 3ER 73. The government moved to strike his testimony. Ortega was called outside the presence of the jury. There, he testified that Drickerson and he *never* spoke to Azano about whether it was "lawful for him to have a personal firearm". 3ER 99a-100. Ortega said, "We didn't get into the details about legal or if he's American or no." 3ER 100. He didn't know that Mr. Azano was a foreign citizen." *Ibid.* Drickerson never told "him that it was permissible for him to have a firearm." 3ER 101. They never discussed "the legality of it, is it legal or no, we didn't ask if he's a foreign citizen besides of that." 3ER 102. Ortega said Drickerson said to Azano: "if I were you, I'd have a gun." 3ER 103.

The government moved to strike Ortega's testimony as not proving what was proffered to justify an estoppel defense. Wynne argued, "I think the remedy of telling the jury to strike his entire testimony is drastic and in fact prejudicial and would reflect very negatively on Mr. Azano, since we spent so much time on him yesterday." 3ER 104-105.

29

Contrary to his proffer before Ortega's testimony, and contrary to Ortega's testimony, Wynne now told the court he had expected Ortega to say, "Drickersen [was] essentially saying that, look in this circumstance, Mr. Azano, your security matters a whole lot more than any immigration law." 3ER 107.[15]   Ortega testified to no such thing. The court struck Ortega's testimony.  3ER 122.  Wynne predicted Azano would be prejudiced from that, but it was a self-inflicted wound.

6.  <u>In Final Argument, Wynne Admitted He Was Caught "Bluffing" Witnesses and the Jury</u>.  In final argument, Wynne further undermined Azano's right to a fair trial by telling the jury during the trial he had tried to "bluff" them multiple times and got caught.  He said,  "Now all right, folks. I have bluffed the military time thing [in email headers]. I bluffed. It wasn't that important and he [the prosecutor] called me on it. And you know what? I also bluffed with the lines insert Matsura, it's not important."  3ER 136-137.  And again:  "Ernie Encinas had Marc Chase in the palms of his hand, like it or not. And sorry, Mr. [prosecutor], I bluffed on this one too."   3ER 138-139.

The government took full advantage of counsel's "bluffing" admissions in its rebuttal: "Now yesterday, you heard Mr. Wynne tell you during his argument that

---

[15]  Wynne had Drickersen on his witness list "out of an abundance of caution," but never called him.  3ER 109.

30

over the course of this trial on several occasions he was bluffing. He was putting

forth to the jury and he was putting forth to the witness spurious defense arguments.

He was bluffing you." 3ER 147. In other words, he was being deceptive to the

witness and the jury, got caught, and with it, his ability to convey any defense

argument persuasively, if it ever existed, ended.

7. <u>Insulting the Court</u>. When Mr. Kinchen, defense counsel for Susu,

Azano's son, argued about his ability to impeach Elizabeth Lugo with her grand

jury testimony, Wynne added: "The Court may not like Mr. Kinchen because he's

from Louisiana and may not like me because I am from Texas. But I am serious.

We have to have some fairness and if I have to file a motion to disqualify the Court,

I will. This is not fair." 3ER 71. (Kinchen said that was not accurate). The court

responded: "I guess Mr. Wynne is lucky he's in this Court. If he were in some other

Court, he would be in handcuffs a long time before now." *Ibid.*

After being admonished about his speaking objections, he continued them.

For example, after objections were sustained, Wynne told the court, "I think I made

my point, Your Honor," drawing the court's retort, "Again, I guess we don't need

your commentary on the evidence either as we go through it. So we're done with

your questions." 2ER 30-31; repeated at 2ER 42.

Similarly, at Azano's sentencing, the government used Wynne's contemptuous conduct toward the court from a pre-trial hearing: "It was in one of the first hearings in this court in the court's ruling not to sever Mr. Hester's case. That it was Mr. Azano's attorney who twice admonished the court based on its ruling that you have blood on your hands." 3ER 178-179. The trial court responded: "are we blaming all that on Mr. Azano for what his lawyer did?" [Prosecutor] "I let the court decide where to place the blame for those things. The lawyer is an extension of the client." *Ibid.* No doubt the jury felt the same and punished Azano for his attorney's misconduct.

8. Wasting Significant Time on Irrelevancies Triggered Objections and Adverse Rulings. With Ms. Bowman-Fleurov, he spent seven pages of transcript on irrelevant questioning on the manner she drove to Azano's home with candidate Filner in August of 2012. 2ER 191-198.[16] The government objected and the court observed there was no "mention in direct about this that I recall so we are way outside the scope, and we're spending a lot of time on something that doesn't seem to be very helpful. So let's get on to where you want to be and forget about the drawing part." To this, Wynne responded: "I ask to strike the judicial comment on

---

[16] There was no issue that the witness was there, that she drove Filner there, the whereabouts of Azano's home, or what she could see from the home.

the weight of the evidence." 2ER 197. Wynne then continued his map drawing.

The government again objected: "the drawing apparently doesn't reflect the

witness's testimony." The objection was sustained. 3ER 198. Later, Wynne

objected with an assertion of judicial comment on the evidence:

> Your Honor, I really didn't mean or didn't intend to be short with the
> court, but as an officer of the court, I can represent that there is a
> purpose and a strategy behind the questions I ask regardless of whether
> it is necessarily apparent to the court, so as a courtesy to my client, I
> am concerned that some comments beyond the ruling may tend to
> suggest to the jury that I don't necessarily know what I am talking
> about and while I am glad to take that, I have a thick skin, I would ask
> humbly that the court kindly refrain from suggesting that I am
> completely off base and I don't know what I am doing, maybe I do
> make a dumb -- I just don't want that to prejudice my client. Thank
> you. 2ER 210-211.

Instead of attacking her with irrelevancies, he should have emphasized that

the lunch attendees were looking south to other cities for potential development,

when she told them that Mayor Filner had no jurisdiction there. 2ER 190.

a. *Continually bringing up Citizens United v. FEC, 558 U.S. 310 (2010).*

Despite repeated rulings that this topic was irrelevant in examining witnesses, he

continued to do it. 2ER 24, 83, 184; 3ER 45.[17] To show how disingenuous this

was, Wynne asked a local jeweler, Jose Garcia, "I'm handing you, sir, what I

---

[17] An attorney's duty is to yield to rulings. *Sacher v. U.S.*, 343 U.S. 1, 9
(1952)("if the ruling is adverse, it is not counsel's right to resist it or to insult the
judge.")

represent is the opinion of the United States Supreme Court...dated on or about January of 2010…have you read it." 2ER 48-49. Garcia was "not an expert of any sort." *Id*. at 49. Garcia had been called simply to say he been asked by Diego Duque to donate $500 to the Dumanis campaign. The court ruled again, "We're not going to publish any part of that document to the jury." 2ER 49. Other examples: 2ER 83, 184 (when the objection was sustained, Wynne said, "just curious.") At the end of the trial, Wynne sought to introduce a two page summary of the decision. 3ER 118-119. His repeated flouting of court orders would only bring jury disrespect and undermine Azano's case.

9.  Arguing as Prosecution Misconduct From the Very Information He Told the Jury about in Opening Statement. After Filner was elected Mayor in November 2012, he became subject to allegations of sexual misconduct. Thereafter, Mr. Clancy, his campaign director, met with Singh to discuss working on a social media campaign to enhance Filner's image because, as the witness testified, Filner "was embroiled in a lot of negative publicity and press with regards to the sexual harassment allegations." 2ER 234. Wynne vociferously objected to Clancy's statement about Filner's problems, and, outside the jury's presence, said he would be reporting the prosecutor to the Office of Professional Responsibility. 2ER 235-236. Later, he moved for a mistrial, sanctions, dismissal of the indictment,

exclusion of the prosecutor from the trial and a referral to the State Bar. 2ER 2410242. In denying the motions, the court noted that "the only [prior] mention of any sex scandal was by the defense prior to the testimony by Mr. Clancy in opening statement, not by the Government." 2ER 275.[18] The court told Wynne: "You are the only one that brought it up until Mr. Clancy uttered those words as counsel gave me the transcript of the opening statement, the defense is the one who is talking about the sex scandal." 2ER 276. The court observed: "probably everybody in this country knows about Bob Filner and why he resigned. That was part of the reason for the jury questionnaire. Now to hear somebody say this is so outrageous, we have to have a mistrial, it doesn't ring true." 2ER 277. Wynne asked for a limiting instruction on this issue. 3ER 2-3. It does not appear he suggested one.

10. "Throwing Azano under the Bus." With Azano's appearance waived on 8/17/16, Wynne said the following to the court about proceeding with a witness examination:

> you know, I am an elected Director of the State Bar of Texas and I appoint people to the grievance committee. I don't want to appear before. Maybe they'll give me a break. Given that very real possibility and I have a very litigious client. Quite frankly, he's asked me to sue

---

[18] In opening statement, Wynne told the jury: "Well, it's your job. I mean, it's a compelling story that this guy here [Azano] is somehow linked to, for our disgrace, mayor Bob Filner, trying to appeal to your emotions, sex scandal. Nobody would want to be linked to something like that." 2ER 7.

every other lawyer he has ever had, including some I respect. I am probably next on the list. With that in mind, I will not proceed to cross-examination without a direct Court order. 3ER 34-35.

While disparaging his client, Wynne revealed purported privileged communications, all while his client was not present, to distance himself from his own misconduct. Later in the trial, at sidebar and again outside Azano's hearing, Wynne did it again, telling the court: "I am taking a very aggressive position here including things I guess have addressed to my, at the request of my client to provide a very aggressive defense. I do not mean in any way to insult the integrity of the Court. I have a very litigious client who asked me to sue, so even is suing one of his former counsel. I am preserving a record so I don't miss anything if this gets to the Ninth Circuit professionally. I want to apologize if I have offended the Court in any way whatsoever. I am carrying out my client's instructions." 3ER 94. This was more disloyalty to Azano. By distancing himself from his client, telling the jury he did not like Azano, but "this is my job" (2ER 17), he demonstrated a manifest conflicted allegiance.[19]

---

[19] In *Goodwin v. Balkcom,* 684 F.2d 794, 810 (11th Cir. 1982), counsel told the jury he was court appointed to deflect community negativity: "we view trial counsel assertions as indicating a divided allegiance. These assertions... strongly suggest the location of his loyalties.")

36

In contrast to Wynne's characterizations, at the conclusion of trial, the court refused to remand Azano to custody prior to sentencing stating: "He's demonstrated in the Court's view by observing his demeanor and what that he's acted as honorable and is a consummate gentleman throughout." 3ER 150.

### B. Wynne's Conduct Meets The *Strickland* Standard of Ineffectiveness.[20]

1. *The trial court failed to address this issue at the motion for new trial.*[21]  In doing so, the court abused its discretion in declining to hear the claim.  The underlying record was substantially developed, new counsel had been retained, had researched the issue and brought an extensive motion.  The district court stated only it would exercise its "discretion to decline consideration of Azano's ineffective assistance of counsel claim prior to entry of judgment in this case." 1ER 42-43, 48.

_____

[20]  Whether a defendant received ineffective assistance of counsel is reviewed de novo on direct appeal.  See *U.S. v. Nickerson*, 556 F.3d 1014, 1018 (9th Cir. 2009).

[21]  "We have previously held, however, that a defendant need not wait for collateral proceedings to obtain relief from an ineffective attorney. Thus, we have made exceptions to our general rule, allowing claims of ineffective assistance of counsel to proceed '(1) where the record on appeal is sufficiently developed to permit determination of the issue, or (2) where the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel.' *Jeronimo,* 398 F.3d at 1156 (citing *United States v. Daychild*, 357 F.3d 1082, 1095 (9th Cir. 2004))." *U.S. v. Alferahin*, 433 F.3d 1148, 1160, fn. 6 (9th Cir. 2006).

The trial court's error means this Court must now rule on what is indisputably in the record and reverse for ineffective assistance of counsel.

2. *The Strickland v. Washington, 466 U.S. 668 (1984) Standard.* The standard requires a showing of performance that falls below an objective standard of reasonableness (*id.* at 688), which shows a likelihood of a different result sufficient to undermine confidence in the outcome. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy of our adversary process. *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

An accused's right to be represented by counsel is a fundamental component of our criminal justice system for the obvious reason that it is through the lawyer that the defendant's case is presented. If counsel self-discredits himself as well as his client, proves himself disloyal, advocates against his client, this certainly is prejudicial. "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty...." *Strickland,* supra at 688.

In *Buck v. Davis*, 137 S.Ct. 759, 775 (2017), the Court held that "[n]o competent defense attorney would introduce such [negative predictive racial] evidence about his own client." There, the issue was calling an expert to say that the defendant's race was an aggravating factor in a capital trial because it increased

the likelihood of future violence. Here, Wynne argued that Azano was a bad man whose ugly looks and being of a different race (Japanese/Mexican with a "poppy nose") meant the jury wouldn't like him. He went further: he had Azano stand up as an exhibit to demonstrate these points triggering the government's objection "to using Mr. Azano as an exhibit in opening." 2ER 8.

3. *Wynne's Incompetence Prejudiced Azano.* This "representation" was worse than having no counsel at all. It was damaging, disloyal, insulting, humiliating and incompetent. Worse, he told the jury falsities about Azano the jury would believe true given they were coming from defense counsel. An attorney who acts adversely toward his own client has a demonstrable conflict. A "significant conflict of interest" arises when an attorney's "interest in avoiding damage to [his] own reputation" is at odds with his client. *Christeson v. Roper*, 135 S.Ct. 891, 894 (2015), quoting *Maples v. Thomas*, 565 U.S. 266, 285 fn. 8 (2012).

Denigrating Azano, saying he was a "bad guy" whom he disliked and couldn't stand being around, throwing Azano under the bus to the court (outside Azano's hearing) to claim his own bizarre insulting conduct was actually ordered by Azano, were disloyal efforts to separate himself from Azano at his client's expense.

39

Such conduct warrants a presumption of prejudice as in cases where defense counsel slept as evidence was being introduced. *Burdine v. Johnson*, 262 F.3d 336, 338 (5th Cir. en banc 2001); accord *Javor v. United States*, 724 F.2d 831, 834 (9th Cir. 1984). Here, sleeping counsel would have been an improvement.

When defense counsel fails to produce evidence that undermines the prosecution's case, that is ineffectiveness. *Lord v. Wood,* 184 F.3d 1083, 1095-1096 (9th Cir. 1999).[22] Here, Wynne had the evidence (the $700 check). The prosecution highlighted it for him in opening statement, but during 24 days of trial he never attempted to introduce it except by seeking, at the end of trial, a failed stipulation by "gentleman's agreement." A crucial piece of evidence showing lack of knowledge of donation law was thus lost.

Similarly, by not allowing Sheriff Gore to explain that he did not know foreign nationals could not contribute despite his 32 years with the FBI was another loss of evidence to support Azano's lack of knowledge of the law defense. Wynne could have examined Gore directly on this point. He didn't.

---

[22] This court has repeatedly held: "a lawyer who fails adequately to investigate, and to introduce into evidence, [evidence] that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002), quoting *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

40

Telling the jury he got caught three times during trial "bluffing" them (i.e., trying to distort the facts of the case), could only cause a jury to distrust anything Wynne had to say. Another bluff, although not labeled as such, was Wynne's putting on the stand Ivan Ortega and then seeing his lengthy testimony stricken because it failed to live up to Wynne's false proffer. The result was, as Wynne admitted, a remedy so "drastic and in fact prejudicial...[it] would reflect very negatively on Mr. Azano, since we spent so much time on him yesterday." 3ER 104-105.

When prejudice is not presumed, the burden of proving it is on the defendant. *Strickland*, supra at p. 693. To establish prejudice "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at p. 694. Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid*.

When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice. See *Harris v. Wood*, 64 F.3d 1432, 1438-1439 (9th

41

Cir. 1995) [cumulative prejudice obviates the need to analyze the individual prejudicial effects of each deficiency].)

Cumulatively, the pattern of client betrayal, dislike, and insults before the jury, omitting to present exculpatory evidence, "bluffing" the jury, and more combined to deny Azano a fair trial. See also next argument on prejudice due to close case factors. This case must be reversed.

C. <u>Alternatively, Remand Is Required to Have the Motion for New Trial Hearing to Which Azano Was Entitled.</u> Azano filed a motion for new trial based on many of the issues discussed supra. CR 634-1. It was denied on June 1, 2017. It was an abuse of discretion not to hear the issue at the motion for new trial. 1ER 42-43. The court believed the issues were not fully developed as exemplified by the need for an evidentiary hearing. 1ER 47-49. Azano was not sentenced for five more months as the firearms count had to be retried. There was plenty of time. The only need for a hearing would have been to hear from Mr. Wynne. That may not have been necessary given that there could be no reasonable tactical explanation for his conduct. *Zapata v. Vasquez,* 788 F.3d 1106, 1116 (9th Cir. 2015); *United States v. Span,* 75 F.3d 1383, 1390 (9th Cir. 1996).

"'[W]hen a claim of ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court may, *and at*

42

*times should*, consider the claim at that point in the proceeding.'" *United States v. Steele*, 733 F.3d 894, 897 (9th Cir. 2013) (citation and internal quotations omitted; italics added). Resolving the claim pre-judgment is "'particularly [warranted] when the district court is in a position to take evidence, if required, and to decide the issue.'" *Id.,* quoting *United States v. Brown*, 623 F.3d 104, 113 (2d Cir. 2010). This is so because "[r]equiring a defendant to wait for post-conviction relief" will often result in significant prejudice. *Id.* For instance, he or she will *"serve months [or years] in prison waiting for post-conviction arguments to be heard."* *Id.* Moreover, "[l]engthy delays necessarily entail concomitant *weakening of memories and aging of evidence.*" *Id.* Further, in any such future litigation, there is no guarantee the same district judge would preside and thus makes possible the loss of all firsthand judicial experience, and require a new judge to familiarize him or herself with this lengthy record.

Reversal, not a remand, is the only remedy that timely addresses the clear prejudice to Azano.

## II. THE INSTRUCTIONS FAILED TO REQUIRE THE JURY TO FIND AZANO KNEW HE WAS VIOLATING CHARGED FEDERAL LAW BARRING FOREIGN NATIONALS FROM MAKING POLITICAL DONATIONS[23]

Azano was convicted of conspiracy and two substantive counts of making political donations under 18 U.S.C. § 371, 2 U.S.C. 437(g) and 441(e)(1)(A). Azano requested an instruction telling the jury that to act wilfully, it must find: "he knew his actions violated the prohibition on foreign national contributions at the time he performed them," and "knew he was prohibited by law from making such contributions or donations because he was not a United States citizen or legal permanent resident, and he acted knowingly and wilfully." 1ER 131; see fn. 26 infra. He didn't get it. The court ruled that instructing that acting with a "bad purpose to disobey and disregard the law" was sufficient. 1ER 81-82.

A. The Instruction Given. The court stated the intent element as follows:

Fourth, defendant acted knowingly and willfully.

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

---

[23] Review is *de novo*. *U.S. v. Stapleton*, 293 F.3d 1111, 1114 (9th Cir. 2002) ("We review *de novo* whether the district court's instruction omitted or misstated an element of the charged offense.")

44

An act is done *willfully if the defendant acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids*, and again not by mistake or accident. In other words, a person acts "willfully" *when he acts with a bad purpose to disobey or disregard the law*. ¶ *It is not necessary for the government to prove that the defendant was aware of the specific provision of the law that he is charged with violating*. Rather, it is sufficient for the defendant to act knowing that his conduct is unlawful, *even if he does not know precisely which law or regulation makes it so.* 1ER 60-61; italics added.[24]

This diluted definition of intent failed to instruct on the required specific intent to violate the statutory prohibition that foreign nationals could not donate to candidates and committees, and that the defendant intended to violate that law. It permitted conviction based on a general awareness that something Azano did was unlawful, but not that he knew it was illegal as a foreign national to donate.

When people are unaware of a law criminalizing conduct not inherently wrong, courts have imposed a specific intent requirement to ensure the offender is aware of the law making the conduct unlawful.[25] Thus, the government needed to

---

[24] The instructions for Count 4 (1ER 67-70), are similarly defective in containing the erroneous language in Instruction 23.

[25] Foreign nationals currently may make contributions to "issue advocacy" campaigns. *Bluman,* supra at 800 F.Supp.2d 284. Until 1974, it was not illegal for foreign nationals to donate to political candidates, and not until 2002 to donate to political parties. *Id.* at 283-284.

45

prove Azano intended to fund donations knowing that as a foreign national he would be violating federal campaign prohibitions.

B.  Willfulness and Specific Intent.  As stated in *Bluman v. FEC*, 800 F.Supp.2d 281, 292 (D.D.C. 2011), "There are many aliens in this country who no doubt are unaware of the statutory ban on foreign expenditures, in particular;" thus, the statutes require "proof of the defendant's knowledge of the law."  Knowing the law means exactly that: it does not mean knowing generally some law like municipal or state prohibitions; it means the defendant knew he was violating federal law that foreign nationals could not contribute to political candidates and committees.[26]

In *United States v. Goland*, 959 F.2d 1449 (9th Cir. 1992), this Court approved instructions telling the jury the defendant needed to intend to violate the federal donation statutes charged in the indictment.  Goland was convicted of making excessive contributions to a political campaign in violation of 2 U.S.C. §§

---

[26] Wynne submitted an instruction quoting *Bluman* as requiring "proof of the defendant's knowledge of the law." 3ER 123; 1ER 134d. Co-counsel for Azano argued,  per *Bluman,* the wilful violation of the federal law was required. 3ER 123-124. Singh's counsel added: "They must prove beyond a reasonable doubt that Mr. Singh knew that Mr. Azano was prohibited by the federal election laws from contributing...." 3ER 114.  (The parties joined in each other's comments and objections.  3ER 113.)

441a(a)(1)(A) and 437g(d). He contended the court erred in failing to instruct that *specific intent* to violate the criminal laws charged in the indictment "may not be inferred solely from Mr. Goland's failure to adhere to administrative or civil provisions of the federal election law." The district court actually gave that instruction by telling the jury to assess whether Goland "had the required *specific intent* to violate the law *charged in this indictment*." 959 F.2d 1454; italics added.

The requirement of specific intent to knowingly violate the charged federal law is not a novel concept. In this regulatory world, it is the requisite element for such offenses.[27] Further, the Rule of Lenity, discussed below, requires such specific intent. See *AFL-CIO v. FEC,* 628 F.2d 97, 101 (D.C.Cir. 1980) (willful violation of 2 U.S.C. § 437g(a)(7) required a "'knowing, conscious, and deliberate flaunting'" of the Act.) See also *Screws v. United States*, 325 U.S. 91, 107 (1945) ("the jury

---

[27] *See Ratzlaf v. United States,* 510 U.S. 135 (1994)(currency structuring law required defendant to know he violated federal law [prior to statutory amendment]). With tax avoidance, there must be "'proof of willfulness in the sense of a *specific intent to evade or defeat the tax or its payment.*' [Citation]" *U.S. v. DeTar* 832 F.2d 1110, 1114 (9th Cir. 1987). See also *Hanlester Network v. Shalala*, 51 F.3d 1390, 1400 (9th Cir. 1995) ("We construe "knowingly and willfully" in § 1128B(b)(2) of the anti-kickback statute [prior to amendment] as requiring...the specific intent to disobey the law.") General bad purpose is not enough. E.g., *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004) (court properly instructed jury it could not convict for violating Embargo law unless "the defendant knew that such transmission of funds was a violation of the Iranian embargo, and was, thus, illegal.")

should have been further instructed that it was not sufficient that petitioners had a generally bad purpose. To convict it was necessary for them to find that petitioners had the purpose to deprive the prisoner of a constitutional right, e.g. the right to be tried by a court rather than by ordeal.")

The government relied on *United States v. Whittemore,* 776 F.3d 1074 (9th Cir. 2015). That case does not deal with this specific intent issue. There, convictions were upheld for a Nevada citizen making excessive campaign contributions and contributions in the name of others to Senator Harry Reid's reelection campaign. The defendant's primary contention was that unconditional gifts under Nevada law cannot be conduit contributions in violation of federal law because the funds became property of the ultimate donors. On the intent instructions, he argued "the court's failure to instruct the jury on his unconditional gift theory prevented the jury from fully considering whether he had the intent to make an illegal conduit contribution." This Court rejected the argument. The government will rely on language that the defendant "acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids." *Id.* at 1080-81. That instruction would not meet specific intent requirements, but in that case, the quoted language was preceded by a detailed description of the federal law involving contributions ("it is unlawful when

48

a defendant solicits others to contribute to a candidate for federal office in their own names and furnishes the money for the contribution") which made clear the intent the defendant had to possess.  The case does not deal with Azano's instructions on foreign nationals and the lack of a specific intent requirement.[28]

C. Rule of Lenity Requires the Intent Element Be Defined as Specific Intent to Violate the Charged Federal Donation Law.  Vagueness permeates the instructions on the intent element. It is a "familiar principle" that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Skilling v. United States*, 561 U.S. 358, 410 (2010).  The vaguely stated intent instruction "cannot be squared with the beyond-a-reasonable-doubt standard applicable in criminal trials or with the need to express criminal laws in terms ordinary persons can comprehend." *Burrage v. United States*, 134 S.Ct. 881, 892 (2014.) "Especially in the interpretation of a criminal statute subject to the rule of lenity [Citation], we cannot give the text a meaning that is different from its ordinary, accepted meaning, and that disfavors the defendant."  *Id.* at 891.

---

[28] In *Whittemore*, the Court did not approve or disapprove the lower court language in *U.S. v. Whittemore*, 944 F.Supp.2d 1003 (D.Nev. 2013), which stated the government need not prove the defendant's awareness of the specific law's commands.  That decision was wrong.

D. <u>The Error Prejudiced Azano</u>. The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from using instructions that have the effect of lessening its burden of proof. *Francis v. Franklin*, 471 U.S. 307, 326 (1985); *Patterson v. Gomez*, 223 F.3d 959, 962 (9th Cir. 2000). When constitutional error occurs the government must prove it harmless beyond a reasonable doubt. *McDonnell v. United States*, 136 S.Ct. 2355, 2375 (2016); *Neder v. United States*, 527 U.S. 1, 4 (1999).

This jury was given an instruction saying it could convict if it found intent "to do something the law forbids, and again not by mistake or accident. In other words, a person acts 'willfully' when he acts with a bad purpose to disobey or disregard the law." This was far too vague a standard to inform what was precisely required. It did not inform the jury of the specific intent element. For example, the jury could have taken this open-ended intent to convict after finding any violation of an election law. With Exhibit 14-1 (1ER 134), the jury had evidence, a stipulation of a $10,000 fine of straw contributor Michael Pedace indicating he exceeded the $500 contribution limits for City candidates in violation of San Diego Municipal Ordinance §27.2935. The stipulation stated he violated the law by also contributing on behalf of another under §27.2944, and specifically for aiding and abetting Azano in the making of those contributions, in violation of §27.2991. 1ER

50

136; 2 ER 50. These were local law violations cited against Azano as well as

Pedace. They were in evidence and were provisions the jury could have relied upon

to find the generalized intent of a law violation in the instruction.[29]

Any reliance on the conspiracy instructions to save the day similarly fails.

First, the conspiracy conviction itself fails because substantive counts 3 and 4 fail.

*United States v. Aguon*, 851 F.2d 1158, 1169 (9th Cir. en banc 1988) (error in

instructions on substantive count of extortion required reversal of conspiracy to

extort).

The same instructional error exists with the conspiracy charge. Conspiracy is

a specific intent offense. *United States v. Little,* 753 F.2d 1420, 1443  (9th Cir.

1984)("we note that 18 U.S.C. § 371 is, by definition, a specific intent crime.")

Ordinarily, the "mens rea requirement of § 371 eliminates any objection that the

statute punishes the accused for an offense of which he or she was unaware." *Ibid.*

But not where, as here, the substantive instructions undermined the ability of the

---

[29] Any argument that the evidence shows Azano "should have known" the
federal law cannot suffice. One cannot be convicted of a specific intent offense
because he should have known "because the logical relationship between what he
*could have known* and a specific intent has no rational basis."  *U.S. v. McDonald*,
576 F.2d 1350, 1359 (9th Cir. 1978), quoting *U.S. v. Piepgrass*, 425 F.2d 194,
199-200 (9th Cir. 1970) (emphasis in original).

conspiracy to inject the requisite specific intent into the charges. Conspiracy requires proof *and* instructions on "the requisite intent necessary to commit the underlying substantive offense." *United States v. Abushi*, 682 F.2d 1289, 1293 (9th Cir. 1982). But the conspiracy instruction was similarly defective, stating:

> The crime of conspiracy is the *agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.*
> 1ER 56.

Further, this case was not one of overwhelming evidence on intent. In fact, there was little intent evidence. Azano's jury was out deliberating for over five days, September 1, 5, 6, 7, 8, delivering verdicts on the 9th. 3ER 223-225. In a case with an avalanche of paper exhibits including many emails and texts, there is no communication indicating Azano was aware of specific donations, and certainly nothing to show he was aware of the federal laws concerning them. As the record reflects, Encinas told Clancy he could manipulate Azano to give money to any cause Encinas selected. Encinas had strong personal motivations to be a player in San Diego politics and Azano had demonstrated zero such interest before hiring Encinas to run security for his family. Further, Azano was extremely busy with work on his company and out of the country so much that he hardly was in a position to mastermind a conspiracy. None of the campaign professionals in Dumanis or Filner's teams thought to directly ask Azano about his immigration

52

status or explain that he could not participate in donating. Had Azano had an inkling his donations would be illegal, he could simply have asked his U.S. citizen wife to make them from her community property resources.

The intent issue was close. This error cannot be shown harmless. E.g., *Gentry v. Roe,* 320 F.3d 891, 902 (9th Cir. 2003) (finding a reasonable probability of a different result after finding the evidence of intent not overwhelming and noting the jury deliberated for six hours before reaching a verdict); accord *Rhoden v. Rowland,* 172 F.3d 633, 637 (9th Cir. 1999); *Gibson v. Clanon,* 633 F.2d 851, 855, fn. 8 (9th Cir. 1980). Convictions on Counts 1, 3 and 4 must be reversed.

## III. THE PROSECUTION FAILED AS A MATTER OF LAW TO SATISFY THE MATERIAL ELEMENTS ON THE 18 U.S.C. §1519 CONVICTIONS .

Appellant adopts and incorporates Singh's Argument IV. Although Singh was convicted of two 1519 counts, the arguments apply to counts 5-37 charging Azano with causing or making false entries on campaign records in order to obstruct an investigation concerning campaign contributions. As with Singh, the government failed to introduce evidence to satisfy the elements: 1) Azano caused campaigns to fail to disclose contributions; 2) Azano intended to impede or influence a future, undetermined investigation; 3) of an investigation he attempted to impede; and 4) that the completed campaign forms fell within United States

jurisdiction.   Each deficiency is fatal to the convictions. There was no evidence Azano knew campaigns filed reports much less that he caused inaccurate filings by donors or intended to impede an investigation within U.S. jurisdiction.[30]   The government's theory relied on Azano having to know of (1) campaign contribution reporting requirements, (2) the required reports, and (3) their incompleteness.

To Singh's arguments, Azano adds three points:

A.  The Court's 1519 Instructions Were Inconsistent and Allowed an Illegal Path to Conviction.[31]   These counts were premised on omissions, yet Azano's jury was told in Instruction 29 that acting knowingly meant: "[t]he government is not required to prove that the defendant knew that his acts or omissions were unlawful." 1ER 71.  On the other hand, it instructed: "[a]n act is done willfully if the defendant acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids." 1ER 72.  Thus, the instructions

---

[30] Azano filed motions to dismiss these counts on these and other grounds. CR 112.

[31] Wynne did not object on these grounds.  The issue is reviewable as ineffective assistance of counsel (U.S. v. Span, 75 F.3d 1383, 1389-1390 (9th Cir. 1996); see Argument I), or as plain error because the error is clear or obvious, affects substantial rights, and seriously affects the fairness of the proceedings. See United States v. Reyes Vera, 770 F.3d 1232, 1243 (9th Cir. 2014) (plain error not to instruct the jury on how to appropriately evaluate [agent's] opinions).

stated there is *no* need to show Azano knew his acts were unlawful, but then say he must know some part of his conduct was unlawful. Such inconsistency on the intent/knowledge element cannot be squared with Due Process. "While we presume jurors follow the instructions they are given, we cannot equally assume they can sort out legal contradictions." Doe v. Busby, 661 F.3d 1001, 1023 (9th Cir. 2011). If jurors convicted based on Azano having no knowledge of unlawfulness, the conviction is void for lack of the intent element. Due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).

Additionally, the instructional clause "with knowledge that some part of his course of conduct was unlawful" is so vague as to undermine the required intent element. How much knowledge of unlawfulness is "some part?" If Azano believed 1% of his conduct was unlawful, is that sufficient? See *Burrage v. United States*, 134 S.Ct. 881, 892 (2014) ("Unsurprisingly, [the government] could not specify how important or how substantial a cause must be to qualify [for the enhancement]. ... Is it sufficient that use of a drug made the victim's death 50 percent more likely? Fifteen percent? Five? Who knows.") Accord *U.S. v. Miller*, 767 F.3d 585, 592 (6th Cir. 2014) (hate crime motive element defective).

55

B. Count 33, the Business Donation to the PAC, Fails Under the First Amendment. Azano's U.S. based company, AIRSAM, made a $100,000 contribution to a Dumanis PAC which the PAC duly reported. See pp. 8-9, supra; argued in Azano's motion. CR 112-1, 24-26. Under the First Amendment, "Congress may not prohibit political speech, even if the speaker is a corporation or union." *Citizens United v. FEC*, 558 U.S. 310, 376 (2010). This was a duly reported lawful contribution by a U.S. company. See proposed Ex. 2653, FEC Advisory Opn., 2000-17, 1ER 145-154.[32] See also 2ER 33-37. Count 33 fails.

C. Reversal of the §1519 Counts Requires Reversal of the Conspiracy Count (Count 1) and Counts 3 and 4. Overturning the 1519 counts also requires reversal of Counts 1 (conspiracy). The indictment alleged the 1519 conduct was part of the conspiracy. 1ER 19. The instructions said the jury need only find a plan to commit one of the crimes alleged. 1ER 56. We know the jury found the section 1519 counts against Azano so, if those counts fail, they fail as the predicate for the conspiracy as well.

---

[32] Kelly Maruccia, political consultant, advised Filner supporter Bowman-Fleurov that U.S. based companies could contribute. 2ER 186-187.

Counts 3 and 4, the §441e(a) and 441f convictions, fail also because of the lack of intent (Argument II) and because of the prejudicial spillover effect of all void convictions. See *Gersten v. Senkowski*, 426 F.3d 588, 614 (2d Cir. 2005).

## IV. CONGRESS LACKS JURISDICTION TO REGULATE CAMPAIGN FINANCE IN LOCAL ELECTIONS AND APPLICATION OF SECTION 441E TO A LONG-TERM RESIDENT OF CALIFORNIA (AZANO) IMPERMISSIBLY BURDENS FREE SPEECH

Appellant joins Singh's Arguments I and II. The district court erred in not dismissing the section 441e, conspiracy counts and section 1519 counts for lack of federal jurisdiction and on First Amendment grounds.

## V. FAILURE TO DISMISS THE FIREARMS POSSESSION COUNT (18 U.S.C. § 922) WAS REVERSIBLE ERROR.

Gun possession is permitted by persons holding valid visas to be in the United States. A handgun was located in a shared closet of Azano's home when he pointed it out for agents prior to their executing a search warrant. 3ER 153-154. Azano was convicted of unlawful possession of the gun. 3ER 177. That conviction must be vacated.

18 U.S.C. §992g(5)(B) makes it unlawful for a nonresident alien to possess a handgun except as provided in subsection (y)(2)(A). The latter statutory subsection states the prohibition does not apply "to any alien who has been lawfully

admitted to the United States under a nonimmigrant visa, if that alien is--(A)

admitted to the United States for lawful hunting or sporting purposes...."

The State Department admitted Azano to the U.S. with a B1/B2 visa. 2ER 20-22.  That visa permits "activities of a recreational nature, including tourism, amusement...."  22 CFR 41.31(b)(2); Addendum, iii.

Possession of a gun can be of a "recreational nature" or for "amusement" under the regulation.  Either the regulations and statute authorized Azano to possess a gun.  If not, the laws are unconstitutionally vague as applied because a visa holder must guess at the meaning of the statute.

Azano moved to dismiss the count on these grounds. The trial court denied the motion (CR 794), but recognized its substance:  "Once again, interesting argument.  Not necessarily black and white...."  1ER 104.  If the law is not "black and white" to a federal court, how is a lay person unschooled in the law to know what is permitted?  Before the retrial, after a hung jury, the court again denied these defense arguments. 1ER 36-42.

The Rule of Lenity requires the courts to limit the reach of the statute to the clear import of its text and construe ambiguity against the government. "[I]t is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.  We should not derive

criminal outlawry from some ambiguous implication. [Citations]" *Ladner v. United States,* 358 U.S. 169, 177-178 (1958).

Nothing in 18 U.S.C. § 922, or the regulations related to B1/B2 visas, explains that "legitimate activities of a recreational nature, including tourism, amusement..." (activities explicitly permitted under B1/B2 visa regulation) are different than "sporting purposes" (activities permitted by 922(g)(5)(B)), or that a "recreational purpose" or "sporting purposes" exclude possession for target shooting or collecting.

In *United States v. Orellana*, 405 F.3d 360 (5th Cir. 2005), the court noted the ambiguity in 18 U.S.C. § 922(g)(5)(A), which prohibits aliens *illegally* in the United States from possessing firearms. Orellana entered illegally and later received TPS ("temporary protected status"). The Circuit found the application of §922 to Orellana ambiguous, applied the rule of lenity, and held Congress did not intend to criminalize the possession of firearms by aliens in Orellana's TPS position. "[W]e cannot say with certainty that Congress intended to criminalize the possession of firearms by aliens who have been granted temporary protected status." *Id*. at 371.

So too here. Azano, in the country legally, is allowed under his visa to engage in "recreational" or "amusement" activities. This included activities such as target shooting or gun collecting, and necessarily possession.

A. If the Regulations and Statute Do Not Authorize Azano to Possess a Gun The Law is Unconstitutionally Vague as Applied. The law was not "black and white" to the district court. Visa holders must guess at the laws meaning. *Johnson v. United States*, 135 S. Ct. 2551 (2015), holds that a criminal law violates due process where it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *Id.* at 2556. Living under a rule of law means "[all persons] are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). Applying the law to criminalize Azano's possession of a handgun in his home exemplifies arbitrary enforcement under a vague law. This count must be reversed and dismissed.

60

## CONCLUSION

The judgment must be reversed or the case dismissed.


May 11, 2018                          Respectfully submitted,


                                      *s/Charles M. Sevilla*
                                      CHARLES M.  SEVILLA
                                      Attorney for Appellant Azano




**STATEMENT OF  RELATED CASES.   F.R.Cr.P. Circuit Rule 28-2.6.**
*U.S. v. Ravi Singh*, No. 17-50337 (joined for oral argument and excerpts per April 17, 2018, Commissioner's Order.  Dkt. 951)




**CERTIFICATE OF WORD COMPLIANCE**
This brief is double and proportionally spaced in 14 point Word Perfect Times Roman and, according to WordPerfect 16 software, contains 13,997 words.

May 11, 2018                          *s/Charles M. Sevilla*
                                      Charles M. Sevilla
                                      Attorney at Law

# ADDENDUM

**2 U.S.C § 441f** [*now 52 U.S.C. § 30122*]: "No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person."

**2 U.S.C. § 441e** [*now 52 U.S.C. § 30121*]: (a)  Prohibition. It shall be unlawful for--
(1)  a foreign national, directly or indirectly, to make--
(A)  a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;
(B)  a contribution or donation to a committee of a political party; or
(C)  an expenditure, independent expenditure, or disbursement for an electioneering communication ...); or
(2)  a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.
(b)  "Foreign national" defined. As used in this section, the term "foreign national" means– (1)  a foreign principal, as such term is defined by section 1(b) of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611(b)), except that the term "foreign national" shall not include any individual who is a citizen of the United States; or
(2)  an individual who is not a citizen of the United States or a national of the United States (as defined in section 101(a)(22) of the Immigration and Nationality Act [8 USCS § 1101(a)(22)]) and who is not lawfully admitted for permanent residence, as defined by section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)).

**2 U.S.C. § 437g** [*now 52 U.S.C. § 30109*], in relevant part:
(d)  Penalties; defenses; mitigation of offenses.
(1)  (A) Any person who knowingly and willfully commits a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure--
(I)  aggregating $ 25,000 or more during a calendar year shall be fined under title 18, United States Code, or imprisoned for not more than 5 years, or both; or
(ii)  aggregating $ 2,000 or more (but less than $ 25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.

**18 U.S.C. § 1519**: "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."

**18 U.S.C. §922(g) states in relevant part:**

It shall be unlawful for any person [to possess a gun]—...

    (5) who, being an alien--

    (A) is illegally or unlawfully in the United States; or

    (B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

    ........to... possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.



    (y) Provisions relating to aliens admitted under nonimmigrant visas....

    (2) Exceptions. Subsections (d)(5)(B), (g)(5)(B), and (s)(3)(B)(v)(II) do not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is--

    (A) admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States;...

**22 C.F.R. § 41.31 Temporary visitors for business or pleasure.**

**(a)** Classification. An alien is classifiable as a nonimmigrant visitor for business (B-1) or pleasure (B-2) if the consular officer is satisfied that the alien qualifies under the provisions of INA 101(a)(15)(B), and that:

(1) The alien intends to leave the United States at the end of the temporary stay (consular officers are authorized, if departure of the alien as required by law does not seem fully assured, to require the posting of a bond with the Secretary of Homeland Security in a sufficient sum to ensure that at the end of the temporary visit, or upon failure to maintain temporary visitor status, or any status subsequently acquired under INA 248, the alien will depart from the United States);

(2) The alien has permission to enter a foreign country at the end of the temporary stay; and

(3) Adequate financial arrangements have been made to enable the alien to carry out the purpose of the visit to and departure from the United States.

**(b)** Definitions.

(1) The term "business," as used in INA 101(a)(15)(B), refers to conventions, conferences, consultations and other legitimate activities of a commercial or professional nature. It does not include local employment or labor for hire. For the purposes of this section building or construction work, whether on-site or in plant, shall be deemed to constitute purely local employment or labor for hire; provided that the supervision or training of others engaged in building or construction work (but not the actual performance of any such building or construction work) shall not be deemed to constitute purely local employment or labor for hire if the alien is otherwise qualified as a B-1 nonimmigrant. An alien seeking to enter as a nonimmigrant for employment or labor pursuant to a contract or other prearrangement is required to qualify under the provisions of § 41.53. An alien of distinguished merit and ability seeking to enter the United States temporarily with the idea of performing temporary services of an exceptional nature requiring such merit and ability, but having no contract or other prearranged employment, may be classified as a nonimmigrant temporary visitor for business.

**(2)** The term "pleasure," as used in INA 101(a)(15)(B), refers to legitimate activities of a recreational character, including tourism, amusement, visits with friends or relatives, rest, medical treatment, and activities of a fraternal, social, or service nature.

No. 17-50387

No. 17-50337

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | CR 14-388 MA |
| v. | ) | Souther Dist. of Calif. |
| | ) | |
| JOSE SUSUMO AZANO MATSURA | ) | |
| | ) | Certificate of Service |
| Defendant-Appellant. | ) | |
| _____ | ) | |

I hereby certify that I electronically filed the foregoing appellant's opening brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 11, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

May 11, 2018                               s/  Charles M. Sevilla