CA No. 17-50337

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

RAVNEET SINGH,                      )
                                    )
        Defendant-Appellant,        )        DC No. 3-14-cr-0388-MMA
                                    )
    v.                              )
                                    )
UNITED STATES OF AMERICA,           )
            Plaintiff-Appellee.     )
_____)

_____

**APPELLANT'S REPLY BRIEF**
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Honorable Michael M. Anello, United States District Judge

Todd W. Burns                          Harold J. Krent
Burns & Cohan, Attorneys at Law        IIT Chicago-Kent College of Law
1350 Columbia Street, Suite 600        565 West Adams Street
San Diego, California 92101            Chicago, Illinois 60661-3691
Ph: (619) 236-0244                     Ph: (312) 906-5010
Email: Todd@burnsandcohan.com          Email: hkrent@kentlaw.iit.edu
Co-Counsel for Ravneet Singh           Co-Counsel for Ravneet Singh

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

ARGUMENT ........................................................................................1

    I.   The Court Below Erred by Failing to Instruct the Jury that Knowledge of Azano's Foreign National Status Was a Material Element of the Crime ...2

    II.  The Court Erred in Instructing the Jury as to the Material Elements of a Section 1519 Offence and Insufficient Evidence was Presented to the Jury to Satisfy those Elements............................................................6

    III. The Court Below Erred in Failing to Instruct the Jury That Evidence of More than One Conspiracy was Presented to the Jury, and there was Insufficient Evidence of One Overall Conspiracy to Sustain the Conviction ....................................................................................15

    IV. The Court Erred in Finding that Congress, Despite our Federalist Structure, has the Power to Override a State's Determination of its own Political Community ................................................................................20

    V.  The Court Below Erred in Implicitly Finding that Congress has a Compelling State Interest in Defining the Nature of State and Local Governments' Political Communities and therefore can Abridge the First Amendment Rights at Stake .................................................27

CONCLUSION ....................................................................................31

CERTIFICATE OF WORD COMPLIANCE........................................31

CERTIFICATE OF SERVICE ............................................................32

# TABLE OF AUTHORITIES

## Cases

*Ambach v. Norwich,* 441 U.S. 68 (1979) ................................................24

*Bluman v. Fed. Election Comm'n,* 800 F. Supp. 2d 281 (D.C. Cir. 2011) ...... passim

*Bridges v. Wixon,* 326 U.S. 135 (1945) .................................................28

*Brown v. EPA,* 521 F.2d 827 (9th Cir. 1975) .........................................23

*Bryan v. United States,* 524 U.S. 184 (1998) .......................................3, 4

*Cabell v. Chavez-Salido,* 454 U.S. 432 (1981) .....................................24

*Cintron-Garcia* v. *Romero-Barcelo*, 671 F.2d 1 (1st Cir. 1982) .............23

*Foley v. Connelie,* 435 U.S. 291 (1978) ..............................................23

*Green v. City of Tucson,* 340 F.3d 891 (9th Cir. 2003) ..........................27

*Gregory v. Ashcroft,* 501 U.S. 452 (1991) ...........................................22

*James v. Bowman,* 190 U.S. 127 (1903) ......................................... 20, 22

*Kotteakos v. United States,* 328 U.S. 750 (1946) .................................19

*Marinello v. United States*, 138 S. Ct. 1101 (2018) ........................ 13, 14

*McCutcheon v. FEC,* 134 S. Ct. 1434 (2014) .................................. 28, 29

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ............................................20

*Perkins v. Smith*, 370 F. Supp. 134 (D. Md. 1974) ...............................23

*Pope v. Williams,* 193 U.S. 621 (1904) ...............................................25

*Public Integrity Alliance v. City of Tucson,* 805 F.3d 876 (9th Cir. 2015) .............27

*Ratzlaf v. United States,* 510 U.S. 135 (1994) ....................................3, 4

*Sugarman v. Dougall,* 413 U.S. 634 (1973) .................................... 24, 25

*Taylor v. Beckham,* 178 U.S. 548 (1900) .............................................23

*Taylor v. Kentucky,* 436 U.S. 478 (1978) ...............................................5

*United State. v. Calhoon*, 97 F.3d 518 (11th Cir. 1996) .........................8

*United States v. Causey*, 835 F.2d 1289 (9th Cir. 1987) ........................9

*United States v. Chandler,* 388 F.3d 796 (11th Cir. 2004) .....................19

*United States v. Curran,* 20 F.3d 560 (3d Cir. 1994) ............................11

*United States v. Eubanks,* 591 F.2d 513 (9th Cir. 1979) ........................16

*United States v. Facchini,* 874 F.3d 638 (9th Cir. 1989) ........................14

*United States v. Fairchild*, 990 F.2d 1139 (9th Cir. 1993) .....................12

*United States v. Fattah*, 223 F. Supp. 3d 366 (E.D. Pa. 2016) ................13

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) .....................................17

*United States v. Ford*, 639 F.3d 718 (6th Cir. 2011) ................................................14

*United States v. Gaudin*, 28 F.3d 943 (9th Cir. 1994) ...............................................5

*United States v. Gonzalez,* No. 15-50483 (9th Cir. Oct. 10, 2018) ........................13

*United States v. Hsia,* 176 F.3d 517 (D.C. Cir. 1999) .............................................10

*United States v. Kernell,* 667 F.3d 746 (6th Cir. 2012) ................................ 7, 12, 13

*United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) ................................... 16, 19

*United States v. Moyer*, 674 F.3d 192 (3d Cir. 2012)................................................7

*United States v. Norman*, 87 F. Supp.3d 737 (E.D. Pa. 2015) ................................7

*United States v. Reese*, 62 U.S. 214 (1876) ...........................................................20

*United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008).......................................8

*United States v. Santos,* 553 U.S. 507 (2008).........................................................13

*United States v. Schmeltz,* 667 F.3d 685 (6th Cir. 2011) ..........................................7

*United States v. White Eagle*, 721 F.3d 1108, (9th Cir. 2013) .................................8

*Watts v. United States,* 394 U.S. 705 (1969) .........................................................22

*Yates v. United States,* 135 S. Ct. 1074 (2015) ........................................................6

## Constitutional Provisions

U.S. Const. art. IV, §4...............................................................................................22

U.S. Const. amend. I ...................................................................................... passim

U.S. Const. amend. X................................................................................................26

## Statutes

18 U.S.C. 2(b) ................................................................................... 10, 11, 12, 15

18 U.S.C. 1001 ...........................................................................................................8

18 U.S.C. 1519 ............................................................................................... passim

52 U.S.C. 30121 ............................................................................................ 1, 2, 8, 29

Cal. Gov't Code 85320(b)-(c)...................................................................................26

## Other Authorities

Federal Prosecution of Election Offenses 151 (7th ed. 2007) .............................2, 11

Rick Hasen, *Judge Kavanaugh's Sloppy Illogic in the Bluman Foreign Campaign Spending Case: A Question to Ask at the Hearings*, Election Law Blog (September 4, 2018), https://electionlawblog.org/?p=100969 .............................29

Madison Park, *Noncitizens in San Francisco can Register to Vote, but only for School Board Elections*, CNN (July 20, 2018), https://www.cnn.com/2018/07/20/us/noncitizens-vote-san-francisco/index.html ...................................................................................................................25

Opposition to Motion to Dismiss or Affirm, Bluman v. Fed. Election Comm'n, 565 U.S. 1104 (2012)...................................................................................27

Plaintiffs' Motion for Summary Judgment, Bluman v. Fed. Election Comm'n, 800 F. Supp. 2d 281 (D.D.C. 2011)............................................................26

CA No. 17-50337

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| RAVNEET SINGH, | ) | |
| | ) | |
| Defendant-Appellant, | ) | DC No. 3-14-cr-0388-MMA |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee. | ) | |
| _____ | ) | |

## ARGUMENT

Mr. Singh's opening brief canvassed the government's overreach in this case: prosecution and conviction under a federal statute, 52 U.S.C. 30121, that not only intrudes on the states' ability to structure their political communities as they see fit but also infringes upon the First Amendment rights of long-term resident foreign nationals. In response, the government argues that the states' right to define their own political communities can be overridden by Congress, and that foreign nationals in the United States should be allowed free speech rights in every context except campaign donations. But, because the government has so clearly erred in analyzing the requisite statutory elements under Sections 30121 and 18 U.S.C.

1519, and because exoneration on those counts would obviate the necessity for this Court to reach the weighty constitutional claims, Mr. Singh will address those statutory issues first.

## I.      The Court Below Erred by Failing to Instruct the Jury that Knowledge of Azano's Foreign National Status Was a Material Element of the Crime

The court below erred as a matter of law in failing to instruct the jury that it must find that Singh knew that Azano was a foreign national to convict on all counts. SER 5362, 5387.  The government concedes, as it must, that knowledge of Azano's status as a foreign national is a gravamen of both the Section 30121 and 1519 charges, and the government must concede as well that the jury was not so instructed.  Indeed, the government's own manual for prosecuting election law crimes provides that such an instruction be given.  See Federal Prosecution of Election Offenses 151 (7th ed. 2007), https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf ("*DOJ Election Crimes*").

Instead, the government relies (at 47-48) on the district court's general definition of "knowingly and willfully" as sufficient to ensure that the jury determined whether Singh knew that Azano was a foreign national.  The court instructed the jury that, to convict, it only had to find that "the defendant acted knowingly and willfully.  It is not enough that the defendant merely associated

2

with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping Jose Susomo Azano Matsura to commit the crime." SER 5216-17. Nowhere does the instruction say that Singh must have known of Azano's foreign national status – rather it stresses that Singh is liable if he "had the intention of helping" Azano commit the crime. Singh agrees that he provided social media services at Azano's behest[1] – the only question was whether he did so knowing that Azano was a foreign national. The court thus erred as a matter of law in failing to instruct the jury that it had to determine that Singh knew Azano was a foreign national – a material element of the charged offense.

The government's insistence (at 49) that the jury instruction selected followed the mens rea instruction in *Bryan v. United States,* 524 U.S. 184 (1998), only highlights the trial court's error. There, the Court upheld a "willfulness" jury instruction, which declined to require knowledge of the particular law in question – a federal licensing requirement. The question in *Bryan* was whether, as in *Ratzlaf v. United States,* 510 U.S. 135 (1994), the defendant was entitled to an instruction

---

[1] Singh had provided hundreds of thousands of dollars of social media services for Azano in connection with several Mexican projects (Opening Br. at 20-21), and the defense's position was that he undertook the San Diego projects as a favor for Azano. *Id*. at 7.

that he was aware of the law allegedly violated. In no way did the *Bryan* Court dispense with an instruction as to a material element of the offense. Indeed, that Court stated that "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law," *Id.* at 205, and stressed the continuing need for "proof of knowledge of the facts that constitute the offense." *Id.* Thus, under *Bryan,* reversal is mandated here because "proof of knowledge of facts that constitute the offense" was not required.[2]

Not only was that "willfulness" instruction an inadequate substitute for the requested charge, but the varying mens rea instructions as a whole compounded the chance of jury error. A neighboring jury instruction on conspiracy provided that "one may become a member of a conspiracy if he . . . had reason to believe he would benefit from it, even if he is without full knowledge of all the details of the unlawful scheme," SER 5213, and later that, in a conspiracy, "under certain conditions a defendant may be found guilty of a crime even though he or she did not participate directly in the acts constituting that offense." SER 5219. Such instructions plainly fail to apprise a reasonable juror of the need to determine whether Singh knew that Azano was not permitted to contribute to campaigns.

---

[2] *Bryan*, of course, preceded *Bluman*, and thus does not reflect on whether a knowledge of the law requirement is needed in the thorny area of campaign disclosures.

Thus, not only did the court below fail to require that the jury focus on Singh's knowledge of Azano's status, the judge's varying formulations may well have distracted the jury from what should have been its essential task – deciding whether Singh knew that Azano was a foreign national.

But, perhaps more to the point, if the government admits (at 31) it had to prove that Singh knew that Azano was a foreign national, why did it oppose that instruction to the jury? The trial court's agreement with the government was reversible error.

Perhaps in recognition of the flaw, the government argues "no harm no foul" because both sides argued at trial whether Singh knew of Azano's status. The government simply ignores that "arguments of counsel cannot substitute for instructions by the court." *Taylor v. Kentucky,* 436 U.S. 478, 488-89 (1978); see also *United States v. Gaudin*, 28 F.3d 943, 951 (9th Cir. 1994); *aff'd* 515 U.S. 506 (1995). Finally, the government apparently argues (at 58-59) that the error was harmless as well because of evidence submitted as to Singh's knowledge, but the government omits the many witnesses who testified that they thought Azano, like his wife and children, was a U.S. citizen – including District Attorney Bonnie Dumanis (SER 3942), Sheriff Bill Gore (SER 1373), PAC Director Kevin Spillane (SER 1349), fundraiser Samantha Bowman-Fleurov (SER 2470) -- and even Azano's close friend Marc Chase thought he had a green card (SER 3039).

In short, the trial court's failure to include Singh's proposed instruction requiring knowledge of Azano's status dooms conviction on all counts – but for that knowledge, none of Singh's actions can be considered criminal: there could be no conspiracy and no culpability for incomplete campaign disclosures.

## II. The Court Erred in Instructing the Jury as to the Material Elements of a Section 1519 Offence and Insufficient Evidence was Presented to the Jury to Satisfy those Elements

The Section 1519 counts must be dismissed on the basis that the jury was not instructed that Singh must have known of Azano's status to convict. But, in addition, the government's construction of Section 1519 is not only illogical, it is dangerous. The government, in essence, argues that document shredding includes the failure to volunteer information, and that contemplation of an investigation is assumed every time an individual commits a crime. Such an expansive reading of Section 1519 should be rejected.

*No Culpable Omission*

In his opening brief, Singh argued that the statute, by employing terms such as "alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry" cannot be read to include a failure to volunteer information. The Supreme Court has instructed that the language in Section 1519 should be read narrowly. *Yates v. United States,* 135 S. Ct. 1074 (2015). Not surprisingly, the cases cited by

6

the government do not involve situations of third parties failing to volunteer information but rather individuals who have a duty to make a record. For instance, in *United States v. Norman*, 87 F. Supp.3d 737, 746 (E.D. Pa. 2015), relied on by the government (at 70), a police officer failed to include on a required report that he had seized cash during an encounter with suspects. The court stressed that "[b]ut it cannot be that simply because he reported no seizure, as opposed to underreporting the seizure, his actions did not violate Section 1519." Indeed, in *United States v. Moyer*, 674 F.3d 192, 207 (3d Cir. 2012), the court stated that "[i]t borders on the ridiculous to assert that a Chief of Police would not have a *duty* to disclose the identity of suspects in his official police reports" (emphasis added). Nor is *United States v. Kernell,* 667 F.3d 746 (6th Cir. 2012), relied upon by the government (at 72), to the contrary. There, the defendant erased emails to throw off an investigation into his hacking – there was no omission but rather erasure of a record.

Finally, consider *United States v. Schmeltz,* 667 F.3d 685 (6th Cir. 2011). There, in writing a report of his encounter with a prisoner, a sheriff's deputy omitted that he shoved the prisoner and that omission "falsified" the required report. Under the government's view, if third parties had witnessed the encounter and had failed to volunteer that information to the deputy's superior, they, too, would have been liable under Section 1519. The government's omission theory

7

would result in widespread liability for individuals who fail to volunteer information that the government later deems important to an investigation. The plain language of the statute counsels against such an adventurous reading.

In the related context of the false statement statute, 18 U.S.C. 1001, this Court in *United States v. White Eagle*, 721 F.3d 1108, 1118 (9th Cir. 2013), overturned a conviction because the defendant had no duty to disclose fraud on the particular form in question – concealment under the false statement statute requires a preexisting duty. *See also United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008) ("Concealment cases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for disclosure of specific information"); *United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996) ("Falsity through concealment exists where disclosure of the concealed information is required by a statute, government regulation, or form.").

In essence, the government's argument is reductionist. Every violation of Section 30121 (and countless other statutes) would also violate Section 1519 unless the individual involved would, for whatever reason, volunteer the violation to law enforcement authorities. Third parties with relevant knowledge who fail to volunteer that information to law enforcement authorities would presumably also be liable. The anti-shredding statute requires more than failing to report one's own

crime – it requires separate, culpable steps to derail an investigation, as Singh requested in his proposed jury instruction. SER 5366, 5379.[3]

*Section 2(b) Theory*

As an alternative, the government argues that, even if Singh's failure to volunteer information does not satisfy Section 1519's actus reus, he can be found guilty for "causing" someone else to file an incomplete record. This Court's decision in *United States v. Causey*, 835 F.2d 1289 (9th Cir. 1987), presents a classic instance in which a tax protester caused others to file incorrect tax forms by helping them fill out the forms to claim refunds that were not lawfully due. Causing innocent intermediaries to violate the law plainly is sufficient. Two questions arise, first what is the definition of "cause," and second, what is the relevant mens rea?

Singh argued in his opening brief that "cause" means to direct or instruct, as in *Causey*. There is no evidence of direction or instruction in this case. Indeed, the government admitted at trial (SER 35), that Filner's campaign manager was well aware of Singh's work on the campaign (after all, Singh worked openly in Filner campaign headquarters) and independently decided not to disclose that work on

---

[3] On this basis alone, retrial of the Section 1519 counts is required, for it is impossible to determine the basis on which the verdict rested.

campaign reports, even though he was aware that Singh was working at Azano's instigation. In what way did Singh "cause" the Filner campaign to file an incomplete report when it was the independent decision of the Filner campaign not to include such information? With respect to the Dumanis campaign, there was testimony that Singh did not volunteer Azano's alleged involvement, which is not surprising because Azano wanted to keep that involvement in politics quiet.[4] But there was *no* testimony that Singh directed or instructed any campaign official *not* to disclose his social media work, and the campaign was aware that the Electionmall team was participating (not just Singh), SER 1825-35, and chose not to ask questions.

Second, whatever "cause" means, the mens rea must be stricter than knowledge. As the D.C. Circuit stated in *United States v. Hsia, 176 F.3d 517,* 522, 523 (D.C. Cir. 1999), "[t]he mens rea element of the statute provides an outer limit on [the definition of cause], for a weak or implausible causal link would make it more difficult to prove that the defendant brought the effect about 'willfully.'" Section 2(b) is designed to punish conduct that would be a crime if directly performed by the instigator. As the Third Circuit held in *United States v. Curran,*

---

[4] The government's repeated mantra (at 20, 27, 59, 70) that Singh's use of code names for clients reflects a cover up ignores his clients' interest in confidentiality (SER 1792), and there was testimony that Singh used code names in other elections. *See, e.g.,* SER 226-27, 1775.

20 F.3d 560, 568 (3d Cir. 1994), "[w]hen a defendant is charged under section 2(b) with 'willfully causing' an inaccurate report to be filed or omitted from being filed, the government must show that the defendant had 'specific knowledge of the reporting requirements and intent to cause them to be evaded.'" The Court reached that result not merely because the underlying false statement statute required specific intent but rather because, in Section 2(b) cases, a specific intent is required to ensure that the defendant actually intended another party to discharge the particular acts in question. And, the Justice Department manual on prosecuting election law crimes cites that aspect of *Curran* with approval. *See DOJ Election Crimes, supra.*

Measured against that intent requirement, the court's instruction below was woefully deficient. The court instructed the jury that "[a]n act is done willfully if the defendant acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids." SER 5226. "Knowledge that some part of his course of conduct was unlawful" is not enough. There was repeated testimony that Singh may have violated the law by directing his employees to volunteer on the campaign, SER 1399-1400, 1441, 1739-42, so the jury may have jumped to the conclusion that culpability under Section 1519 stemmed from Singh's awareness that "some part of his conduct was unlawful." Rather, a specific intention that the campaign file incomplete or inaccurate reports

is required. Compare this Court's decision in *United States v. Fairchild*, 990 F.2d 1139, 1141 (9th Cir. 1993), relied on by the government (at 72), in which the trial court in a Section 2(b) case instructed the jury that "One acts willfully if one does act voluntarily and intentionally and with the purpose of causing a false QAMA certificate to be filed with the government." There was no comparable instruction here. Accordingly, the court below erred by failing to instruct the jury that, to find that Singh "caused" the campaigns to file incomplete donation reports, he must have had the specific objective that the campaigns file incomplete reports.

*Contemplation of an Investigation*

In an effort to demonstrate that the "contemplation of an investigation" element of the offense was satisfied – whether pursuant to a failure to disclose or 2(b) theory—the government only relies (at 72) on *Kernell*. That court, however, stated that "Congress intended a specific intent to apply throughout Section 1519. The intent required is the intent to obstruct, not some level of knowledge." Thus, even if the government here had shown an intent to commit a violation of the campaign laws, it must show an additional intent to interfere with or impede an investigation. The two crimes do not merge. [5] In *Kernell*, itself, the Court was

_____

[5] Consider the robbery of a federal bank. Under the government's theory, that robber would be guilty of obstructing an investigation if he or she did not take off a mask immediately afterwards. The thief wears a mask, however, not to thwart a contemplated investigation, but rather not to get caught. The Supreme Court has

careful to stress that "there is no doubt from his post that Kernell contemplated that an investigation would occur when he took his action, since he specifically referenced the possibility of an FBI investigation in this post. " *Id.* at 755.  The government's argument in this case, if applied to Kernell, would be that, by not volunteering to the authorities immediately afterwards that he was the one who hacked Governor Palin's account, he had the requisite intent to impede the investigation.  And, as this Court recently stressed in *United States v. Gonzalez,* No. 15-50483 (9th Cir. Oct. 10, 2018), "[t]he evidence also established that the defendants prepared the reports with the intent to obstruct a contemplated investigation into whether the force used against Carrillo was reasonable."  *See also United States v. Fattah*, 223 F. Supp. 3d 366 (E.D. Pa. 2016) (dismissing Section 1519 charge because "Government presented no evidence from which the jury could infer that [defendants] knew of or even contemplated any investigation whatsoever").  The government thus errs by conflating the intent to commit the underlying crime with the intent to impede a subsequent investigation.

Finally, the government ignores the salience of the U.S. Supreme Court's recent decision in *Marinello v. United States*, 138 S. Ct. 1101 (2018).  In the

---

counselled that statutes criminalizing offenses should be construed to avoid a multiplicity of offenses covering the same conduct. *See, e.g., United States v. Santos,* 553 U.S. 507 (2008).

analogous context of a statute designed to protect against an "endeavor to obstruct or impede the due administration" of the tax code, the Court concluded that "it is not enough for the Government to claim that the defendant knew the IRS may catch on to his unlawful scheme eventually." *Id.* at 1110. The flaw there as in this case was the prosecution's failure to introduce any evidence that the defendant took action to impede an investigation. The trial court's refusal to issue the requested specific intent charge is reversible error.

*The Investigation Must be Within the Jurisdiction of United States*

The court below erred in finding that, at the time of the alleged failure to make a disclosure to a local election board, the investigation contemplated was within the jurisdiction of the United States. The government's failure to discuss this Court's decision in *United States v. Facchini,* 874 F.3d 638 (9th Cir. 1989) (en banc), and the Sixth Circuit's decision in *United States v.* Ford, 639 F.3d 718 (6th Cir. 2011), is telling because both cases stand for the proposition that, when the reporting requirements are to a local entity, there must be a sufficiently "direct relationship" between the local entity and the federal investigation to satisfy the language in Section 1519. A violation of a local disclosure law has no such nexus. There is no funding or reporting relationship. Of course, a federal investigation in this case ultimately was launched, but if that were the test, then the decisions in *Facchini* and *Ford* would have been upheld because both included failures to

14

disclose at the local level that, like here, later became the focus of a federal investigation.

In short, Section 1519 does not require anyone to volunteer information to the government, and only applies if an investigation is contemplated at the time of the false record or report. Moreover, Section 1519 can only be violated via Section 2(b) when a defendant instructs or directs an intermediary to violate the statute or at least specifically intends that an intermediary perform an act that would be illegal if discharged by the defendant. Thus, even if Singh knew that Azano was a foreign national, he would not be liable under the Section 1519 counts.

III. **The Court Below Erred in Failing to Instruct the Jury That Evidence of More than One Conspiracy was Presented to the Jury, and there was Insufficient Evidence of One Overall Conspiracy to Sustain the Conviction**

The court below instructed the jury that the government had alleged one unified conspiracy with Azano, Singh, Cortes, Hester, Chase and others. SER 5210-11. The court erred by not alerting the jury, as requested by Singh (SER 5368-69), of the need for unanimity in finding guilt on the alleged conspiracy involving Singh as opposed to the other two or three conspiracies addressed at trial.[6]

_____

[6]Some jurors may have voted to convict Singh because of the conspiracy involving straw donors, others may have voted to convict based on the PAC evidence, and

The government argues (at 74) that it was the jury's role to determine if there were multiple conspiracies, and not the responsibility of the judge. The government's argument is nonsense – it is the judge's obligation to determine if the evidence at trial showed that there was more than one conspiracy in order to prevent juror confusion. The question is whether the trial court erred by rejecting Singh's request to instruct the jury that there was not one overall conspiracy at play but rather multiple conspiracies. This Court time and time again has instructed that it is reversible error for a court to instruct the jury to consider whether there was one overarching conspiracy when in fact the evidence demonstrates that there were multiple conspiracies. For instance, in *United States v. Lapier*, 796 F.3d 1090, 1097-98 (9th Cir. 2015), this Court stated that "because the indictment charged a single conspiracy while the evidence tended to establish separate conspiracies, [it] created a genuine possibility of juror confusion." *See also United States v. Eubanks,* 591 F.2d 513, 517 (9th Cir. 1979) (reversing in part because "[i]f it is possible under the evidence for the jury to find that multiple conspiracies existed, then the court should instruct the jury on the issue"). The danger is that different members of the jury may vote to convict based on the separate conspiracies presented by the evidence.

---

still others based on the provision of social media services. There was insufficient evidence of one unified conspiracy to convict Singh.

In his opening brief, Singh averred (at 55) that there was no evidence that Singh had any connection to Chase, Hester, Wolter and Cortes. Singh's connection was with Azano.[7] In response, the government flippantly states (at 75 n.26) that Singh "does virtually no analysis of the actual evidence presented at trial, simply concluding that there were no ties between him and the other conspirators." Singh agrees that it is difficult to prove a negative -- that in thousands of pages of transcripts there was no mention of any such ties -- but then why does the government fail to point out any such connections?

The government contends that Azano was at the hub of the conspiracy, but never once explains how Singh stood to benefit from the straw donations, the PAC contributions, etc. Singh allegedly stood to benefit by selling social media services, but he did not stand to benefit from any Miami West project. The government responds by arguing (at 79) that Azano had one goal – to influence politics. That may be true, but is beside the point. As this Court stated in *United States v. Fernandez*, 388 F.3d 1199, 1225 (9th Cir. 2004), relied on by the government (at 86), "[a] single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators. Furthermore, the evidence must show that each defendant knew, or had reason to know, that his benefits were

---

[7] Encinas worked for Azano, so Singh had contact with him in working on social media.

probably dependent upon the success of the entire operation…. The inference that a defendant had reason to believe that his benefits were dependent upon the success of the entire venture may be drawn from proof that the coconspirators knew of each other's participation or actually benefitted from the activities of his coconspirators." The government alleges (at 10-13) that there were numerous straw donors for Dumanis; that (at 14-15) Azano attempted to fund a PAC for Dumanis; that (at 22-23) Azano organized numerous straw donors for Filner; and that (at 24-25) Azano persuaded Marc Chase to fund Filner's PAC. None of these allegations involved Singh. Singh would not have earned a penny more whether or not the straw and PAC donations were successful, and again, there was no testimony that Singh interacted with Chase, Hester, Wolter and Cortes.[8]

---

[8] The potential for juror confusion existed on many levels, including which acts could be used in determining if the twenty-five thousand dollar threshold was met. For instance, the government's unsupported statement in its brief (at 20-21) that Singh helped Dumanis with millions of ads is wrong. Many voters and non-voters may have *seen* the ads, which were only displayed days before the election (SER 1619), but there were only 955 clickthroughs from the Google adword campaign in total (SER 1845) and 2000 clickthroughs from the Facebook ad campaign. GEX 2247-009. Ronald Nehring, the Dumanis consultant, testified that Singh's contributions to the website amounted only to several thousand dollars (SER 2096). Indeed, Singh had requested (SER 5369) the court to caution the jury that the $25,000 threshold had to be demonstrated exclusively with respect to the fair market value of the media services provided by Singh.

In addition, the jury could have been misled because the government alleged that all the conspirators except for Singh committed culpable acts, as opposed to the failure to volunteer theory underlying Singh's supposed violation of Section 1519. Indeed, the court's denial of Singh's motion for severance was an abuse of

Moreover, a single goal does not a conspiracy make. In *Lapier* the hub had only one goal – buying drugs – but that did not alter the Court's conclusion that there were two conspiracies to buy drugs and that the various sellers did not know each other and did not benefit from sales to the buyer. In short, the government ignores the teaching of the Supreme Court in *Kotteakos v. United States,* 328 U.S. 750, 754-55 (1946): "where the spokes of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes." Without any connection among the spokes of Chase, Wolter, Hester, Cortes and Singh, reversal is required because the trial court "confuses the common purpose of a single enterprise with the several, though similar purposes of numerous separate adventures of like character." *Id.* at 769. As the Eleventh Circuit summarized in *United States v. Chandler,* 388 F.3d 796, 808 (11th Cir. 2004),"for a wheel conspiracy to exist, those people who form the wheel's spokes must have been aware and must do something in furtherance of some single, illegal enterprise."

---

discretion for just that reason, and Singh moved for a new trial on that ground. SER 5717-18. The government's argument (at 85) that Singh dropped the challenge to the failure to sever is belied by the record.

Finally, the fact that the jury deliberated for five days may well have stemmed from its difficulty in determining who was responsible for what. Because of the error in jury instruction on conspiracy, the conspiracy count involving Singh must be vacated.

### IV. The Court Erred in Finding that Congress, Despite our Federalist Structure, has the Power to Override a State's Determination of its own Political Community

The government argues that Congress can dictate to state and local governments who can vote in and contribute to their elections. Yet, in the few cases that have arisen historically, the Supreme Court has slapped Congress's wrist when attempting to regulate state and local elections.

For instance, in *Oregon v. Mitchell*, 400 U.S. 112 (1970), the Court struck down Congress' directive that states mandate an eighteen-year old voting age. In *James v. Bowman,* 190 U.S. 127 (1903), the Court struck down a congressional enactment criminalizing bribery in state and local elections and, before that, in *United States v. Reese,* 62 U.S. 214 (1876), the Court struck down a federal criminal statute imposing duties on inspectors of municipal elections.

Nonetheless, the government argues (at 36) that Congress's authority over immigration and interest in ensuring a republican form of government empower it "to limit foreign nationals' participation in any election within United States

borders." The government is correct that "self-government . . . begins by defining the scope of the community of the governed," but then never explains why the Founders would have eradicated the right of states – that had previously shaped the nature of their political communities – to continue to decide for themselves who can vote, who can hold office, and who can contribute to their elections. The majority of states historically permitted noncitizens to vote – for a generation, property ownership and residency were the touchstones for voting.[9] Indeed, given that Massachusetts' Constitution (and others such as that of Michigan[10]) permitted voting by foreign resident nationals, it defies credulity that Congress can override such a fundamental state commitment through ordinary legislation. Congress's undoubted power over immigration does not empower it to undermine constitutional commitments, whether the Fourth Amendment, First Amendment, or the very federalist structure of our Constitution. After all, Congress's power over immigration did not – as a matter of history – justify abridgement of speech under the Alien and Sedition Acts. As Justice Douglas observed, "The Alien and Sedition Laws constituted one of our sorriest chapters . . . Suppression of speech

---

[9] See Ron Hayduk, Democracy for All 16 (Routledge 2006)Gua. Congress itself permitted resident nationals to vote when establishing the Northwest Territories in 1789. *Id.* at 17.
[10] *Id.*

as an effective police measure is an old device, outlawed by the Constitution."
*Watts v. United States,* 394 U.S. 705, 711-12 (1969) (Douglas, J., concurring).

The government nowhere explains how the republican form of government
"Guarantee Clause" authorizes Congress to intervene in states to "protect" a
republican form of government. Indeed, by that logic, Congress's insistence on an
eighteen-year old voting age itself could have been seen (through Congress's lens)
as a prophylactic measure to protect a republican form of government in the states
by ensuring more representative suffrage. And, the government could have argued
in *James v. Bowman,* 190 U.S. 127 (1903), that the congressional enactment
prohibiting bribery in state elections also stemmed from the need to protect a
republican form of government, but the Supreme Court struck it down. Nor did the
government in this case point to *any* instance in which the Guarantee Clause has
justified intruding on state autonomy.

The Guarantee Clause does not invest Congress with a roving power to
intrude into the governance structure adopted by each state. Rather, it is a means
in part to prevent the federal government from riding roughshod over the choices
made by each state. As the Supreme Court explained in preserving Missouri's
mandatory retirement age for state judges in *Gregory v. Ashcroft,* 501 U.S. 452,
459 (1991), "[t]hrough the structure of its government . . . and the character of
those who exercise government authority, a State defines itself as a sovereign."

22

Earlier, in *Taylor v. Beckham,* 178 U.S. 548, 570-71 (1900), the Court stated that "[i]t is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers . . . should be exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States."   And, courts have held that the Republican Guarantee Clause supported a state's power to fill interim legislative vacancies by its chosen method.   *Cintron-Garcia* v. *Romero-Barcelo*, 671 F.2d 1, 5 (1st Cir. 1982)  (The Constitution "allow[s] the states themselves to decide whether and when, to fill interim vacancies by appointment or by by-election"). This Court has described the Clause in like vein.  *See Brown v. EPA,* 521 F.2d 827, 838, 840 (9th Cir. 1975), *vacated and remanded for consideration of mootness,* 431 U.S. 99 (1977).  The Guarantee Clause, therefore, provides no justification for the intrusion on state elections.

The government nonetheless argues (at 37) that aliens "may be denied certain rights and privileges when democratic self-government is at stake. . . . For example, the Supreme Court has ruled that the government may bar aliens from voting, serving as jurors, working as police or probation officers, or teaching at public schools, all activities that form part of the political and democratic self-definition process."  For support, the government cites *Foley v. Connelie,* 435 U.S. 291 (1978); *Perkins v. Smith*, 370 F. Supp. 134 (D. Md. 1974), *aff'd* 426 U.S. 913

(1976); *Cabell v. Chavez-Salido,* 454 U.S. 432 (1981); *Ambach v. Norwich,* 441 U.S. 68 (1979); and *Sugarman v. Dougall,* 413 U.S. 634 (1973).

Yet, the government strangely ignores that all of the cases cited involve a *state or local* government restricting the rights of foreign nationals to vote, hold office, and so forth. *No* case involves Congress *prohibiting* states or local governments from authorizing foreign nationals to vote or participate otherwise in the political process. Indeed, the cases cited reinforce our system of federalism – Congress defers when the states decide the nature of their own political communities.

The government also cites (at 36) the discussion by the three-judge court in *Bluman v. Fed. Election Comm'n,* 800 F. Supp. 2d 281, 286-87 (D.C. Cir. 2011), aff'd 132 S Ct. 1087 (2012), that a "state's historical power to exclude aliens from participation in democratic political institutions is part of the sovereign's obligation to preserve the basic conception of political community." But the government overlooks that *states'* historical power to *include* aliens in "participation in democratic political institutions is [also] part of the sovereign's obligation to preserve the basic conception of political community." From the Founding, states have authorized foreign nationals to vote and hold office, with

eleven of the thirteen colonies authorizing such voting upon joining the union.[11]

Indeed, it would have been anomalous for the colonies to have joined the Union

only to have the new Congress alter their choice of political community, despite

the deep federalist understandings underlying the Constitution. And, the Supreme

Court has recognized that states traditionally "provide[d] that persons of foreign

birth could vote without being naturalized for the conditions under which that right

is to be exercised are matters for the states alone to prescribe." *Pope v. Williams,*

193 U.S. 621, 633 (1904), *overruled on other grounds by Dunn v. Blumstein,* 405

U.S. 330 (1972). After all, it is "the States' broad power," not that of the federal

government, "to define its political community." *Sugarman v. Dougall,* 413 U.S.

634, 642 (1973). The government endeavors to sweep aside this tradition in one

fell swoop.

Today, foreign resident nationals can vote on School Board elections in San

Francisco, as well as in other elections around the country. *See, e.g.,* Madison

Park, Non-citizens in San Francisco can Register to Vote,

https://www.cnn.com/2018/07/20/us/noncitizens-vote-san-francisco/index.html.

Nor has California ignored the issue. Rather, California has barred campaign

contributions from foreign corporations, U.S. subsidiaries of foreign corporations

---

[11] Hayduk, supra note 9, at 35-52.

if influenced by foreign management, and nonresidents, but permitted contributions from residents who are foreign nationals such as Azano. Cal. Gov't Code 85320(b)-(c). It is up to the states to determine whether foreign resident nationals can vote and contribute to state campaigns. And, under our federal system, states have the power and interest to ensure that the pernicious foreign influence decried by the government (at 38) will not corrupt the state electoral process. Indeed, California's campaign laws are stricter in part than those of the United States, barring foreign corporations from contributing to local ballot measures that Congress's enactment permits. Congress's effort to trample on the states' ability to structure their political processes as they see fit violates the Tenth Amendment.

To be sure, the *Bluman* court held that Congress enjoyed the power to bar foreign resident nationals from contributing to federal, state, and local elections. But, it never addressed the federalism issue or even adverted to the rich history in our nation of resident national participation in the political life of localities and states. That omission is not surprising given that plaintiffs failed to raise the federalism issue before the three-judge court. https://transition.fec.gov/law/litigation/bluman_bluman_MSJ_and_Memo.pdf or in its subsequent brief in the Supreme Court. http://sblog.s3.amazonaws.com/wp-content/uploads/2011/12/11-275-Bluman-Opp-to-Motion-to-Dismiss-or-

Affirm.pdf.  The federalism issue therefore was not briefed; not argued; and not decided.

In any event, even if it had reached the federalism issue, *Bluman* is not entitled to significant precedential force in this circuit.  This Court's recent decision in *Public Integrity Alliance v. City of Tucson,* 805 F.3d 876 (9th Cir. 2015), provided that "a summary affirmance without opinion in a case within the Supreme Court's obligatory appellate jurisdiction has very little precedential significance.  It does not enshrine as Supreme Court precedent every stroke of the pen in the district court's opinion."  And, because the *Bluman* Court's influence under Ninth Circuit law extends only to "the precise issues presented," *Green v. City of Tucson,* 340 F.3d 891, 902 (9th Cir. 2003), the federalism issue must be squarely faced by this Court.

## V. The Court Below Erred in Implicitly Finding that Congress has a Compelling State Interest in Defining the Nature of State and Local Governments' Political Communities and therefore can Abridge the First Amendment Rights at Stake

Unlike with the federalism issue, the *Bluman* Court did reach the First Amendment issue, holding that Congress's interest in defining the political community constituted the compelling governmental interest justifying what it agreed was the serious infringement of foreign nationals' First Amendment rights: "It is fundamental to the definition of our national political community that foreign

27

citizens do not have a constitutional right to participate in, and thus may be excluded from activities of democratic self-government." 800 F. Supp. 2d at 288. But, once, again, the *Bluman* Court never considered that, however strong the federal government's interest in defining its own political community, its interest in defining the political community of states was far weaker. Indeed, the federal government in this case did not cite *any* case in which Congress, other than through enforcement of the Fourteenth, Fifteenth, Nineteenth and Twenty-Sixth Amendments, has overridden the states' ability to define their own communities. The history of foreign national participation in state and local elections from the Founding itself eviscerates the *Bluman* Court's analysis. *Bluman* should not control because it ignored that, whatever the federal government's interest in defining its own political community, its interest in defining that in the states is far from compelling.

And, as to the First Amendment, there is little need to rehash that the Supreme Court has held that "freedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon,* 326 U.S. 135, 148 (1945), and stressed that "[t]he First Amendment has it fullest and most urgent application precisely in the conduct of campaigns for political office." *McCutcheon v. FEC,* 134 S. Ct. 1434, 1441 (2014). Moreover, the government completely ignores that Congress could have pursued less intrusive steps that would have preserved a wider swath of

speech. *Bluman* did not address the overbreadth issue.[12]  In light of the strong First

Amendment issues at stake, the Supreme Court *after Bluman* has made it

abundantly clear that, in the campaign finance context, as in others, "if a law that

restricts political speech does not avoid unnecessary abridgement of First

Amendment rights, it cannot survive rigorous scrutiny." *McCutcheon,* 134 S. Ct.

at 1446.  As Singh noted in his opening brief (at 27-29), Congress could have

limited the reach of Section 30121 to prohibit campaign contributions from non-

resident aliens, from aliens with ties to foreign governments, or from aliens living

outside the immediate area in which the election takes place.  Section 30121

sweeps too broadly – the ban on a long-time resident national such as Azano with

close ties to the political community cannot be justified.[13]  And, *Bluman* should

not in any event control given that it assumed a compelling federal governmental

interest in defining the nature of state and local political communities, an interest

---

[12] With respect to underinclusivity, the government argues (at 42) that "Congress may legislate on a piecemeal basis, without undermining its compelling interest." Singh agrees that *Bluman* adopted that justification, but *Bluman*'s blithe assessment that foreign influence over express advocacy poses extreme risk to the American public while issue advocacy is not of concern has been subject to severe criticism.  *See, e.g.,*  https://electionlawblog.org/?p=100969 .

[13] Interestingly, *Bluman* itself warned that "extending the current statutory ban to lawful permanent residents who have a more significant attachment to the United Sates" would be problematic.  800 F. Supp.2d at 292.  Mr. Azano's spouse and children are citizens, he has business interests in California, and has lived there at least part-time for years.  Indeed, the government has alleged (Br. at 7) that it was Azano's long-range vision of a Miami West that triggered this case.  His stake in California seems clear.

that can only be considered compelling by shutting one's eyes to our nation's history, our constitutional structure, and Supreme Court precedent.

## CONCLUSION

For the reasons stated above and in his opening brief, Singh respectfully requests the Court to vacate the conviction below.

November 30, 2018                    Respectfully submitted,

*/s/ Todd W. Burns*                  */s/ Harold J. Krent*
Todd W. Burns                        Harold J. Krent
Burns & Cohan, Attorneys at Law      IIT Chicago-Kent College of Law
1350 Columbia Street, Suite 600      565 West Adams Street
San Diego, California 92101          Chicago, Illinois 60661-3691
Ph: (619) 236-0244                   Ph: (312) 906-5010
Email: Todd@burnsandcohan.com        Email: hkrent@kentlaw.iit.edu
Co-Counsel for Ravneet Singh         Co-Counsel for Ravneet Singh

## CERTIFICATE OF WORD COMPLIANCE

We certify that:

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, this reply brief is proportionately spaced, has a typeface of 14 points and contains 6,973 words.

November 30, 2018

*/s/ Todd W. Burns*                  */s/ Harold J. Krent*
Todd W. Burns                        Harold J. Krent
Burns & Cohan, Attorneys at Law      IIT Chicago-Kent College of Law
Co-Counsel for Ravneet Singh         Co-Counsel for Ravneet Singh

31

# CERTIFICATE OF SERVICE

CA No. 17-50337

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| RAVNEET SINGH, | ) | |
| | ) | |
| Defendant-Appellant, | ) | DC No. 3-14-cr-0388-MMA |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee. | ) | |
| _____ | ) | |

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals in the Ninth Circuit by using the appellate CM/ECF system on November 30, 2018.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Todd W. Burns*
Todd W. Burns